# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
Filed: May 5, 2026

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | * | |
| ALEXANDRA ANTONIADES, | * | |
| | * | |
| | * | |
| Petitioner, | * | No. 19-1244V |
| | * | |
| v. | * | Special Master Young |
| | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * * | * | |

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, for Petitioner.
*Crystal Fialkowski*, United States Department of Justice, Washington, DC, for Respondent.

## DECISION ON ENTITLEMENT[1]

On August 21, 2019, Nicholas and Brenda Antoniades filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018), [2] on behalf of their then minor daughter, Alexandra Antoniades ("Petitioner").[3] Pet., ECF No. 1; Am. Pet., ECF No. 26. They alleged that Petitioner developed autoimmune encephalomyelitis[4] as the result of a tetanus, diphtheria, acellular, and pertussis ("Tdap") vaccine she received on August 14, 2017. *Id.* at 1. Respondent argued against compensation, asserting that Petitioner could not establish a causation-in-fact claim by a preponderance of the evidence. Resp't's Rept. at 21, ECF No. 20.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] On June 28, 2023, Petitioner's parents filed a motion to change the case caption, as Petitioner had reached the age of majority and wished to continue the case in her personal capacity. ECF No. 66. I granted this motion on August 7, 2023. ECF No. 67.

[4] Encephalomyelitis is "inflammation involving both the brain and the spinal cord. *Encephalomyelitis*, DORLAND'S MED. DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=16191& searchterm=encephalomyelitis (hereinafter, "DORLAND'S").

A careful analysis and weighing of all the evidence presented in this case in accordance with the applicable legal standards[5] reveals that Petitioner has failed to provide preponderant evidence that the Tdap vaccine she received on August 14, 2017, caused her to suffer from autoimmune encephalomyelitis. Accordingly, Petitioner is not entitled to an award of compensation.

## I.      Procedural History

Petitioner's parents filed the petition on August 21, 2019. Pet. They then filed medical records, an affidavit, and a statement of completion on September 3, 2019. Pet'r's Exs. 1–5, ECF No. 6; Pet'r's Ex. 6, ECF No. 7; ECF No. 9. Petitioner's parents filed additional medical records on October 17, 2019, and on January 6, 2020, along with a statement of completion. Pet'r's Exs. 7–8, ECF No. 11; Pet'r's Exs. 9–11, ECF No. 17; ECF No. 19.

On February 21, 2020, Respondent filed his Rule 4(c) report. Resp't's Rept. On June 4, 2020, Petitioner's parents filed an amended petition, additional medical literature, and another affidavit. Am. Pet.; Pet'r's Ex. 12, ECF No. 23; Pet'r's Ex. 13, ECF No. 24. They then filed a response to Respondent's Rule 4(c) report on July 17, 2020, indicating they had filed the outstanding medical records requested. ECF No. 28. On July 27, 2020, Petitioner's parents filed an expert report from Mahbubul Huq, M.B.B.S., Ph.D., his curriculum vitae ("CV"), and medical literature. Pet'r's Exs. 14–23, ECF No. 29; Pet'r's Exs. 24–33, ECF No. 30; Pet'r's Exs. 34–43, ECF No. 31; Pet'r's Exs. 44–53, ECF No. 32; Pet'r's Exs. 54–56, ECF No. 33. Respondent then filed an expert report from Eric Lancaster, M.D., Ph.D., his CV, and medical literature on November 19, 2020. Resp't's Ex. A, Tabs 1–3, Resp't's Ex. B, ECF No. 38.

Petitioner's parents filed additional medical records on March 17, 2021. Pet'r's Exs. 58–60, ECF No. 40. Additional medical literature and a supplemental report from Dr. Huq was filed on June 14, 2021. Pet'rs Exs. 61–66, ECF No. 45. Respondent filed a supplemental report from Dr. Lancaster on August 24, 2021. Resp't's Ex. C, ECF No. 47. More medical records were filed on April 28, 2022. Pet'r's Exs. 67–70, ECF No. 51.

On September 27, 2022, I held a Rule 5 conference between the parties. *See* Min. Entry, docketed Sept. 27, 2022. Following the status conference, I ordered a supplemental expert report clarifying the alleged diagnosis, medical theory of causation, and clarifying the relevance of conversion disorder. ECF No. 56. On February 13, 2023, Petitioner's parents filed a supplemental report from Dr. Huq, as well as additional medical literature. Pet'r's Exs. 72–87, ECF No. 60. Respondent filed a supplemental report from Dr. Lancaster and supporting medical literature on

---

[5] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the Ruling will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

April 14, 2023. Resp't's Ex. D, Tabs 1–2, ECF No. 62. Additional medical records were filed on May 16, 2023. Pet'r's Ex. 88, ECF No. 63.

On June 28, 2023, Petitioner's parents filed a motion to change the case caption, as Petitioner had reached the age of majority and wished to continue the case in her personal capacity. ECF No. 66. I granted this motion on August 7, 2023. ECF No. 67.

On April 1, 2024, I scheduled an entitlement hearing for this case to be held on December 5 and 6, 2024. ECF No. 68. Petitioner filed her pre-hearing brief on August 30, 2024. Pet'r's Br., ECF No. 71. Respondent filed his pre-hearing brief on November 5, 2024. Resp't's Br., ECF No. 74. On November 13 and 14, 2024, the parties filed their pre-hearing submissions. ECF Nos. 75–84. The entitlement hearing was held on December 5 and 6, 2024. *See* Min. Entry, docketed Dec. 6, 2024. No post-hearing briefs were filed.

This matter is now ripe for consideration.

## II.    Medical History

Petitioner was born on May 18, 2005. Pet'r's Ex. 4 at 6. Her pre-vaccination medical history was significant for an allergy to stinging insects, a history of febrile seizures, and swimmer's ear. Pet'r's Ex. 2 at 6–11; Pet'r's Ex. 5 at 101.

On August 14, 2017, Petitioner was 12 years old when she received the Tdap vaccine. Pet'r's Ex. 1 at 4. One month later, on September 15, 2017, Petitioner presented to Children's Primary Care Medical Group ("CPCMG") with complaints of dizziness and paresthesias in her legs. Pet'r's Ex. 4 at 6. Her parents reported that two weeks prior she returned from a friend's house with a cold that subsided within two days. *Id.* Nine days before visiting CPCMG, Petitioner began to experience episodes of dizziness and lightheadedness that lasted roughly one minute and occurred about four times per day. *Id.* Her episodes would occur whether sitting or standing and occasionally when running or playing tennis but would subside after sitting and resting. *Id.* Her parents also reported that Petitioner had developed a new symptom of "stiff, heavy" legs and an inability to stand four days ago, accompanied by pain in her ankles. *Id.* Petitioner's attending physician, pediatrician Ruey-Sjiuan Tsang, noted that Petitioner was experiencing one of these episodes at the time of her examination. *Id.* Her parents also noted that Petitioner had headaches before and after he leg episodes, and that Petitioner had been experiencing vision problems for approximately six months. *Id.* Petitioner's parents further reported that they delayed seeking treatment because they initially believed Petitioner's symptoms to be the result of overuse following a tennis tournament. *Id.* at 7.

On examination, Dr. Tsang noted that Petitioner had experienced a fever two weeks ago at the beginning of symptoms, but that the fever had since subsided. Pet'r's Ex. 4 at 7. She also recorded a "visual disturbance" in Petitioner's eyes, as well as arthralgias, a gait problem, dizziness, weakness, lightheadedness, and headaches. *Id.* Dr. Tsang wrote that Petitioner's symptoms "all [began] after acute viral [upper respiratory infection ("URI")] just prior to onset of these symptoms." *Id.* at 10. Dr. Tsang also noted that aside from her vision problems, Petitioner's

3

neurologic examination was otherwise normal. *Id.* She considered Guillain-Barré Syndrome[6] ("GBS") due to Petitioner's prior URI but noted that Petitioner's symptoms were episodic. *Id.* Dr. Tsang acknowledged that Petitioner had previously received the Tdap vaccine, "which is another predisposition of [GBS]." *Id.* "She does not have fever or neck pain to suggest meningitis." *Id.* Dr. Tsang opined that Petitioner's symptoms may also be a "post-strep phenomenon" due to her sore throat at onset and scheduled Petitioner for a follow-up examination the next day. *Id.*

Petitioner returned to CPCMG on September 16, 2017, and was seen by Dr. George Madany. Pet'r's Ex. 4 at 14. In addition the symptoms relayed to Dr. Tsang, Dr. Madany noted that Petitioner was also experiencing pins and needles in her feet. *Id.* On examination, Dr. Madany noted all neurological symptoms to be within normal limits and her deep tendon reflexes ("DTRs") registered as +2. *Id.* at 16. He considered GBS as a possible diagnosis but noted that this would be more likely related to her prior URI than the Tdap vaccination. *Id.* at 17. Petitioner was instructed to return if her symptoms worsened. *Id.*

Later that evening Petitioner presented to Dr. Jackson Vane at the Rady Children's Hospital ("RCH") emergency department ("ED") with complaints of leg pain and weakness. Pet'r's Ex. 3 at 38. Her history section noted that she began to experience numbness and tingling over the top of her legs that day, and that she had missed school last week due to her symptoms. *Id.* Petitioner described the pain as "a hot tingling pain," and Dr. Vane noted that there were "[n]o known aggravating or alleviating factors." *Id.* at 38–39. On examination Dr. Vane observed Petitioner was experiencing back pain, joint swelling, myalgias, dizziness, lightheadedness, headaches, and fatigue. *Id.* at 39. He also observed tenderness over her thighs and in the lumbar area with full strength in both legs. *Id.* at 40. Dr. Vane's differential diagnoses included nerve pain, dehydration, and musculoskeletal pain, and he ordered a CK test to rule out rhabdomyolysis. *Id.* at 41. Petitioner also underwent an electrocardiogram ("EKG"), which was normal. *Id.* Dr. Vane consulted with neurology, who opined that no further testing was required. *Id.* She was advised to stop sports for one week and was discharged home. *Id.*

Petitioner returned to Dr. Madany on September 22, 2017, with complaints of pain in her legs and lower back. Pet'r's Ex. 4 at 21. She reported that she was experiencing "random dizziness" one to two times per day but did not feel like passing out and that "sitting down help[ed]." *Id.* She had also developed carsickness. *Id.* at 22. On examination Petitioner's neurologic systems were within normal limits and her DTRs registered as +2. *Id.* at 23. Dr. Madany opined that her condition appeared to be "like [post]-infectious myositis" and instructed her to return if her symptoms worsened or failed to improve. *Id.* at 23. He also noted that Petitioner's orthostasis appeared to be an independent issue and would await a neurological evaluation. *Id.*

On October 7, 2017, Petitioner presented to ophthalmologist Mona Adams due to a failed vision screening. Pet'r's Ex. 3 at 87. Petitioner reported difficulty seeing the board at school and that she "recently had a virus causing diplopia[7] and dizziness." *Id.* She was prescribed glasses and sent home. *Id.* at 91.

---

[6] GBS is a "rapidly progressing ascending motor neuron paralysis of unknown etiology, frequently seen after an enteric or respiratory infection." *Guillain-Barré Syndrome*, DORLAND'S.

[7] Diplopia, also called double vision, is "the perception of two images of a single object." *Diplopia*, DORLAND'S.

4

On October 13, 2017, at 2:36am, Petitioner presented to the RCH ED with complaints of fatigue and an inability to stand. Pet'r's Ex. 3 at 125. She reported that her leg pain began "[one] month ago" and improved after 10 days, but "[i]n [the] last [four-to-five] days [the] pain got worse." *Id.* She described the pain as "heaviness, weakness, [and] throbbing" that lasted for about five minutes and then returned again 10 minutes later. *Id.* She also had now developed "stiff, tingling fingers," double vision, and heavy eyelids, which last for about one minute and then resolve. *Id.* Her attending physician, Dr. Matthew Kline, noted that she had an appointment with neurology later that morning. *Id.* Her physical examination was unremarkable. *Id.* at 126. Dr. Kline reported that her workup from her prior ED visit resulted in a normal EKG, CBC, CMP, and mildly elevated lipase. *Id.* at 127. He further noted that neurology declined a workup given her impending neurology appointment. *Id.* Dr. Kline's differential diagnoses included myasthenia gravis,[8] GBS (with a note of normal reflexes), post-viral myositis[9] (which he noted did not account for all of her symptoms), multiple sclerosis[10] ("MS"), orthostatic hypotension, and somatic disorder, and she was discharged home. *Id.* at 126–27.

Petitioner returned to RCH later that morning for her neurology appointment and was seen by neurologist Anuja Jindal. Pet'r's Ex. 3 at 167. Petitioner reported that her neurologic symptoms began about four weeks ago and had now progressed to a "heavy" feeling in her legs where she "feels like she cannot walk." *Id.* The episodes occurred when she was both sitting and standing, occasionally associated with dizziness, lightheadedness, and headaches. *Id.* She previously was experiencing episodes three times per day, but two weeks ago she returned to normal until her symptoms returned one week prior. *Id.* Now she had begun to experience dizziness, double vision, and heavy eyelids while slumping over. *Id.* at 168. Petitioner reported that these episodes occasionally included chest pain, shortness of breath, and paresthesias in her legs, though she reported no loss of consciousness. *Id.* In her history, Dr. Jindal also took note of Petitioner's URI about one week before symptom onset. *Id.* She also noted that "[i]n late August [Petitioner received the] Tdap booster [and f]elt ok after getting [the vaccine]." *Id.*

On examination Petitioner's neurologic systems were all noted as normal aside from mildly brisk DTRs in her right bicep. Pet'r's Ex. 3 at 173. Dr. Jindal also reported that Petitioner began to experience an episode of leg heaviness during the examination "and had some hesitation with walking, but exam[ination] remained non-focal." *Id.* Dr. Jindal ultimately opined that Petitioner's "exam[ination] and symptoms [did] not conform to a known neurological diagnosis. She likely had post-viral myositis initially but this has likely resolved." *Id.* She also noted that although Petitioner experienced a URI prior to symptoms, she did not suspect GBS "given intact reflexes and overall improving symptoms." *Id.* Dr. Jindal also noted that Petitioner stated she had experienced mild anxiety and that her symptoms "recurred when she was to return to school." *Id.* "There is a high likelihood that her symptoms are behavioral in nature, although conversion

---

[8] Myasthenia gravis is "an autoimmune disease of neuromuscular function due to the presence of antibodies to acetylcholine receptors at the neuromuscular junction." *Myasthenia Gravis*, DORLAND'S.

[9] Myositis is "inflammation of a voluntary muscle." *Myositis*, DORLAND'S.

[10] MS is "a disease in which there are foci of demyelination throughout the white matter of the central nervous system." *Multiple Sclerosis*, DORLAND'S.

disorder[11] is a diagnosis of exclusion." *Id.* Dr. Jindal ordered labs for vitamin B12, vitamin D, iron levels, and ordered neurologic imaging. *Id.*

Petitioner returned to CPCMG on October 18, 2017, with complaints of difficulty breathing and a rapid heart rate. Pet'r's Ex. 4 at 26. Petitioner reported her symptoms began while waiting for a tutor at home and felt her heart rate increase and felt like she could not breathe, which lasted for about one minute. *Id.* Another episode occurred 10 minutes later. *Id.* Petitioner reported that she was feeling anxious about not seeing her friends and missing school. *Id.* Her provider noted that her physical examination was normal but that Petitioner had "reproducible chest wall pain." *Id.* at 28. The provider opined that her difficulty breathing was "related to anxiety about tachycardia." *Id.* She was advised to keep a journal of her symptoms, referred for a Holter monitor, and discharged. *Id.* Her Holter monitor was reported as normal on October 23, 2017. *Id.* at 240. An October 31, 2017 magnetic resonance imaging ("MRI") of her brain was also normal. *Id.* at 316.

On November 17, 2017, Petitioner returned to Dr. Madany with continued complaints of difficulty walking and muscle weakness for two months. Pet'r's Ex. 4 at 30. She reported that she had experienced loss of consciousness, double vision, blurry vision, ringing in her ears, pain in her legs, tingling in her fingers and toes, and chest pain. *Id.* at 30–31. Her physical examination was normal, but Dr. Madany noted that she "struggle[d] to walk, need[ed] assistance." *Id.* at 32. Dr. Madany ordered an MRI of her spine and an electroencephalogram ("EEG"). *Id.* He also noted she was not suffering from GBS and that her diagnosis was "[c]onversion per neuro[logy]." *Id.*

Petitioner returned for a neurology follow-up with Dr. Jindal on December 5, 2017. Pet'r's Ex. 3 at 340. Dr. Jindal reported that she had had several phone calls with Petitioner's parents since her previous visit "for new and persistent symptoms of varying frequency," including fainting spells, leg paralysis, tingling in fingertips, tongue tingling, and jaw clenching. *Id.* at 341. Dr. Jindal further noted that the family had not identified a trigger for any symptoms and that symptoms never occurred during tutoring sessions. *Id.* Petitioner remained out of school and she had experienced occasional fainting spells when spending time with friends. *Id.* Petitioner's appetite and physical activity had also decreased and she had gained about four-to-five pounds since her last visit. *Id.* Dr. Jindal reported that Petitioner's neurologic examination was "entirely nonfocal" and that "[t]he etiology of [her] symptoms [was] still unclear. Her exam[ination] and symptoms [did] not conform to a single known neurological diagnosis." *Id.* at 344. Dr. Jindal agreed with Dr. Madany's order of a spinal MRI and discouraged a lumbar puncture at this time due to her normal neurologic examination. *Id.* She also recommended Petitioner see a counselor as "the past few months have been difficult for [Petitioner] emotionally." *Id.* Dr. Jindal scheduled a follow-up for February 2018 and told her family to call if her symptoms worsened. *Id.*

On December 13, 2017, Petitioner presented to cardiologist Matthew Williams for evaluation of her syncope. Pet'r's Ex. 3 at 406. Dr. Williams noted that Petitioner had begun experiencing 10 to 15 syncopal episodes per day since September 2017. *Id.* He also noted that Petitioner's musculoskeletal symptoms did not have an "apparent association [with her syncope] other than also starting in September." *Id.* Petitioner's parents also questioned whether the Tdap

---

[11] Conversion disorder is "a mental disorder characterized by conversion symptoms . . . having no demonstrable physiologic basis and whose psychological basis is suggested by [] exacerbation of symptoms at times of psychological stress." *Conversion Disorder*, DORLAND'S.

vaccination could have caused her symptoms. *Id.* Dr. Williams opined that the etiology of her symptoms was inconsistent with arrhythmia and "not suggestive of a vasovagal etiology or any abnormality in cardiac or vascular function." *Id.* at 408. He also opined that conversion disorder or another functional neurologic disorder was possible, though acknowledged this was outside his realm of expertise. *Id.* He ultimately recommended Petitioner continue to pursue neurologic evaluation and deferred to neurology for further recommendations. *Id.* Petitioner completed her spinal MRI two days later on December 15, 2017, which was normal. *Id.* at 445.

Petitioner's parents returned to Dr. Madany on January 3, 2018, to discuss the next steps for diagnosing her condition. Pet'r's Ex. 4 at 35. Her parents reported that she continued to experience all symptoms and had begun to experience episodes where she could not ambulate. *Id.* at 36. Dr. Madany informed her parents that he had reported Petitioner's history to GlaxoSmithKline ("GSK"), the vaccine manufacturer, and noted "[p]ossible [Vaccine Adverse Event Reporting System ("VAERS")]." *Id.* at 37. He also stated that GSK informed him that most symptoms resolved within one month, and that there were no available studies beyond that timeframe. *Id.* "Other[] situations may imply ?MS, autoimmune conditions being unmasked by vaccine." *Id.* Dr. Madany ordered an EEG to be completed on January 10, 2018, a repeat MRI to screen for MS, prescribed vitamin D, and recommended a psychiatric consultation. *Id.*

On January 8, 2018, Petitioner presented to Dr. Susan Biffl at the RCH rehabilitation clinic and relayed her history of symptoms. Pet'r's Ex. 3 at 475. Dr. Biffl discussed conversion disorder with Petitioner and her parents, explaining that "this was a disorder that is not under [Petitioner's] control and always has a neurologic finding that is generally not in an expected physiologic distribution." *Id.* Dr. Biffl recommended a continued neurologic workup to rule out other possible causes and to start intervention for conversion disorder, as well as psychiatric intervention. *Id.* Petitioner underwent continuous EEG monitoring from January 10, 2018, to January 11, 2018. *Id.* at 537. Her "typical events of brief impaired consciousness were captured without a seizure pattern," and the family was informed these events were non-epileptic. *Id.* Petitioner and her mother were advised to see a child psychologist for stress management. *Id.*

Also on January 10, 2018, Dr. Madany submitted a VAERS report for Petitioner. Pet'r's Ex. 10 at 2. The onset date of Petitioner's symptoms was noted to be September 15, 2017, 32 days after vaccination. *Id.* at 3. "The report[] considered the blurred vision, walking difficulty, increased reflexes, myopia, creatine phosphokinase increased, paresthesia, numbness, myalgia of lower extremities, lower extremities weakness . . . and dizziness to be possibl[y] related to [Tdap]." *Id.*

Petitioner presented for a rheumatology consultation with Dr. Robert Sheets on January 18, 2018. Pet'r's Ex. 3 at 667. Dr. Sheets noted that Petitioner's symptoms began on September 6, 2017, and that Petitioner was no longer experiencing headaches with her symptoms. *Id.* at 671. He also reported that Petitioner did not feel anxious or depressed and that there was no family history of depression. *Id.* at 672. Her parents reported that she received the Tdap vaccine about "[two-to-three] weeks prior to this start of symptoms and . . . [felt] that this [was] the cause of these symptoms." *Id.* Dr. Sheets ultimately opined:

> if this is not a conversion reaction and I would think that would be unlikely due to the episodic nature of her symptoms and if this is not some form of seizure disorder and she has seen neurology and they do not think that is the case given a normal 24

> hour [EEG] then this could represent some form of inflammatory brain disease that is autoantibody induced without personality changes. I don't think that this could represent [central nervous system ("CNS")] vasculitis.

*Id.* at 674. Dr. Sheets recommended a CNS autoimmune antibody blood panel and requested to see Petitioner again in two weeks. *Id.* Petitioner's panel returned normal for CBC and differential, CRP, DNA, DS antibody, Sjogren's antibody, RNP antibody, and Smith antibody. *Id.* at 713. Her ESR and C3 were borderline elevated and her ANA screen IFA was borderline positive. *Id.* Petitioner followed up with Dr. Williams on January 25, 2018, for an EKG, which was normal. *Id.* at 751. Dr. Williams did not feel any further cardiologic testing was warranted. *Id.* at 786.

Petitioner presented for a physical therapy evaluation on January 31, 2018, where her parents again reported that she received the Tdap vaccine prior to the start of her symptoms. Pet'r's Ex. 3 at 819. Her physical therapist noted mild weakness in her hips, mild tightness in her quads and hamstrings, and balance issues with both ankles. *Id.* at 821. Her therapist recommended Petitioner return to regular exercise to return to baseline function and continue physical therapy twice per week for six weeks. *Id.* Petitioner continued physical therapy through June 4, 2018, at which point she had met all of her goals and was discharged to a home exercise program. *Id.* at 974, 1003, 1032, 1140, 1218, 1248, 1304, 1333, 1362, 1391, 1458.

The same day, Petitioner returned for a follow-up with Dr. Biffl, who noted Petitioner had "consistently documented normal neurologic exam[inations] by multiple providers, normal [EKG] and normal [EEG] with fainting episodes not associated with epileptiform activity." Pet'r's Ex. 3 at 891. Petitioner's parents reported that she continued to have fainting episodes and stated that "their [primary care provider ("PCP")] listed [Tdap] as an allergy and [] called this a reaction which they are pleased with." *Id.* Dr. Biffl further noted that Petitioner's parents "would like to know if this is a reaction to an immunization [and] if they have seen the correct providers." *Id.* Petitioner's physical examination was normal and Dr. Biffl recommended Petitioner continue physical therapy, explore psychiatric options, and contact her school to develop a plan for her return. *Id.* at 397.

The next day, on February 1, 2018, Petitioner returned to Dr. Sheets for a follow-up visit. Pet'r's Ex. 3 at 400. He noted that Petitioner's testing thus far had been normal and that Petitioner's

> [d]ad is concerned that it is related to vaccines (but not anti-vaccine) and brings [GSK] side effect profile about syncope and tonic clonic motions; although symptoms occurred [two-to-three] weeks after the vaccine. PCP listed Tdap as an allergy. Parents called company and verified that this has occurred but did not clarify it would cause persistent symptoms.

*Id.* Dr. Sheets also noted that Petitioner's parents were aware conversion disorder was a possibility. *Id.* His ultimate impression was an "inflammatory brain disease that is autoantibody induced without personality changes (and reiterated with parents that inflammatory brain disease is unrelated to vaccines) or conversion reaction although unlikely due to episodic character." *Id.* at 404. Dr. Sheets ordered a blood autoimmune antibody panel and stated he would follow up with Petitioner's parents once he had the results. *Id.* Dr. Sheets also had pediatrician Crystal Stephens examine Petitioner and speak to her parents about whether the Tdap vaccine could have caused

Petitioner's symptoms. *Id.* at 405. She explained that she had "never seen any reaction to immunization create this set of symptoms" and that such a determination is best left to a specialist in infectious diseases. *Id.* She also noted the possibility of immune mediated inflammatory brain diseases, and that if testing for these were negative, to proceed with a lumbar puncture to check for autoimmune encephalopathy. *Id.*

The following week, on February 8, 2018, Petitioner presented to infectious disease specialist Mark Sawyer. Pet'r's Ex. 3 at 940. Petitioner's parents noted "the receipt of a Tdap vaccine approximately [three] weeks prior to the first symptom onset." *Id.* at 940–41. Her physical examination was normal. *Id.* at 941. Dr. Sawyer noted that Petitioner's symptoms "can not be easily explained" given their intermittent nature, long duration, "lack of fever, and lack of significant laboratory abnormalities," which he noted make an infectious disease "very unlikely." *Id.* at 943. "The timing of onset . . . make a vaccine reaction unlikely in that the rare neurologic events . . . usually appear within [one-to-two] days following vaccination. Further, if these symptoms were a result of a post-vaccination . . . reaction [he] would have expected an abnormal MRI." *Id.* He also noted the only remaining helpful test would be a lumbar puncture, but did not think it would be very revealing. *Id.*

With regard to the vaccine, Dr. Sawyer wrote the following:

I had a long discussion with the family about vaccine adverse events including the fact that the adverse events listed in the vaccine package inserts are an accumulated list of all reactions that occurred during clinical trials and not reflective of patterns of symptoms occurring in single patients. I told them that [Petitioner's] symptoms were not anything I had heard of or read about as associated with a vaccine. I did suggest that [Petitioner's] symptoms be reported to the [VAERS] since that is the only way rare reactions might be recognized. They agreed and will send me the vaccine lot number information for her Tdap vaccination so I can file a VAERS report. We discussed the fact that just because symptoms are reported in VAERS does not mean they are caused by vaccines. I acknowledged that I could never completely exclude the possibility that [Petitioner's] symptoms were related to her prior vaccination but encouraged them to consider the alternative diagnosis of a conversion reaction.

Pet'r's Ex. 3 at 943. Dr. Sawyer planned to search VAERS for any similar Tdap reactions, submit the VAERS case report, and follow up with neurology and rheumatology to decide whether to proceed with a lumbar puncture. *Id.*

On March 8, 2018, Petitioner presented to neurologist Mark Nespeca for a second opinion following what Dr. Nespeca described as an "abnormal" antibody test. Pet'r's Ex. 3 at 1061. He also noted that Petitioner was scheduled to review the results with Dr. Sheets later that afternoon. *Id.* Dr. Nespeca explained that Petitioner's autoimmune encephalopathy panel was "indicative of abnormal findings of a low range titer of 0.09 nmol/L (normal < 0.02 nmol/L)" for neuronal ganglionic acetylcholine receptor antibody ("AChR") antibody. *Id.* Dr. Sheets was interested in Dr. Nespeca's opinion because "that antibody has been associated with a variety of symptoms of autonomic dysfunction, peripheral neuropathy and cognitive disorders especially in patients with known carcinomas." *Id.* Dr. Nespeca opined that Petitioner did not "seem to have a typical profile

9

of a child with psychosomatic disorder as she is truly bothered by the effect this has had on her life and she is anxious to get back to school." *Id.* at 1065. He observed that although she lacked the features of "gastrointestinal dysmotility or sicca syndrome . . . many of her symptoms are quite possibility related to autonomic . . . and peripheral neuropathy symptoms." *Id.* He further noted that Petitioner lacked the diagnostic criteria of postural orthostatic tachycardia syndrome ("POTS")[12] and did "not show statis exam[ination] features of a peripheral neuropathy" and her reflexes were normal. *Id.* "Some patients with this antibody have substantial cognitive disturbance or bad psychosis or depression none of which seem[ed] to be plagueing (sic) her now." *Id.* Dr. Nespeca expressed concern that a previous study "noted that several of the patients in [the] series were found to have carcinomas who were not previously known to have a cancer," and opined that a workup to investigate renal, pancreatic, and thyroid cancers was reasonable. *Id.* He endorsed a trial therapy of steroids, intravenous immunoglobulin ("IVIG"), or methotrexate to reduce Petitioner's titers and recommended another autoimmune encephalopathy panel to check her levels. *Id.* He also told Petitioner's parents that he had "not seen such symptoms occur in temporal relation to her Tdap immunization she had a couple weeks before the symptoms began." *Id.* He ordered ultrasounds of her thyroid, kidneys, and abdomen to screen for cancer and planned to discuss next steps with Dr. Sheets and Dr. Jindal. *Id.* at 1066.

Later the same day Petitioner presented to Dr. Sheets to follow up regarding "possible autoimmune encephalomyelitis." Pet'r's Ex. 3 at 1103. Dr. Sheets noted that her labs showed "positive anticholinesterase ganglioside antibody [that] can be associated with dysautonomia and neuropathy according to case reports." *Id.* He also noted that her spells were occurring less frequently at once per day, but her spells lasted "a substantial amount of time." *Id.* Dr. Sheets opined that her positive antibody test made "autoimmune inflammatory brain disease more likely" and recommended IVIG and prednisone treatment. *Id.* at 1107. He also repeated her encephalopathy panel. *Id.*

Petitioner returned to Dr. Sheets on March 21, 2018, who noted that Petitioner's symptoms had not improved despite 40mg of prednisone daily, and that she had developed dizziness, headaches, and epigastric pain. Pet'r's Ex. 3 at 1170. Dr. Sheets reduced Petitioner's prednisone to 30mg and recommended IVIG if her symptoms still did not improve. *Id.* at 1174. Her repeat encephalopathy panel showed her AChR ganglionic neuronal antibody remained elevated at .10. Pet'r's Ex. 7 at 23. Petitioner returned again to Dr. Sheets on May 9, 2018, and reported only one syncopal episode since her last visit. *Id.* at 1421. She also had developed mild knee and ankle pain. *Id.* Petitioner planned to return to school in the fall and Dr. Sheets planned a slow wean off her prednisone. *Id.*

On July 25, 2018, Petitioner followed up with Dr. Sheets and noted that she had been off prednisone for 10 days. Pet'r's Ex. 3 at 1489. She had only one brief syncopal episode since her last visit and experienced some fatigue and deceased appetite but denied headaches, rash, numbness, weakness, and pain. *Id.* Dr. Sheets reported that she was "doing much better with minimal symptoms that [he thought were] unrelated to her disease course and hopefully she will not relapse." *Id.* at 1492. He recommended only seeing Petitioner on an as-needed basis and noted he would start her on prednisone again if her symptoms relapsed. *Id.*

---

[12] Gastroparesis is "paralysis of the stomach, usually from damage to its nerve supply." *Gastroparesis*, DORLAND'S.

Petitioner returned for a follow-up visit with Dr. Nespeca on July 27, 2018. Pet'r's Ex. 3 at 1524. Dr. Nespeca noted that Petitioner had declined his ultrasound recommendations and that Petitioner planned to restart school and competitive tennis. *Id.* at 1524–25. His impression was "[p]resumed autoimmune neurological disorder with wide array of peculiar symptoms . . . that resolved on prednisone therapy . . . . Dad reported a theory that [Tdap] vaccine might be culprit in producing elevation in this antibody titer." *Id.* at 1525. Dr. Nespeca recommended a repeat of her encephalopathy panel to check her antibody titers and proceed with next steps accordingly, including the ultrasounds he previously recommended if her levels remained elevated. *Id.* Her antibody panel came back on August 17, 2018, and revealed an elevated neuronal ganglionic AChR antibody of 0.06. Pet'r's Ex. 7 at 18.

On September 10, 2018, Petitioner returned to Dr. Sheets with complaints of several episodes about one week after the start of school. Pet'r's Ex. 3 at 1587. Her parents reported that she experienced four-to-five episodes that day, including fatigue, dizziness, and a heavy feeling in her arms and legs while sitting in the car on the way to school. *Id.* She also reported being "very fatigued the last [two] weeks; she has also had some dizziness and nausea." *Id.* Her spells had now become daily and on September 9, 2018, Petitioner could not move her hands due to weakness. *Id.* She also was now experiencing dizziness and shortness of breath while running in P.E. class, but she had not experienced this problem while playing tennis. *Id.* Dr. Sheets ordered a repeat of her encephalopathy panel and restarted her on 5mg of prednisone. *Id.* at 1590. He also noted

> It is curious that she is flaring her symptoms with fatigue and dizziness as school starts and now has spells that occur for minutes over a short period of time but that she is not able to go to school because of this; the father still feels that this is due to antibodies of the prior pertussis vaccine; I will see if she is still antibody positive prior to starting very lose dose prednisone. I would however wonder if stress is the trigger for these symptoms at this time.

*Id.*

Petitioner presented to Dr. Nespeca on October 1, 2018, for a second opinion of her new occurrence of symptoms. Pet'r's Ex. 3 at 1683. Dr. Nespeca noted her new symptoms included hand, jaw, and eye paralysis. *Id.* at 1684. Her antibody titer had also increased to 0.11 nmol/L. *Id.* "Her father remains convinced that the cause of the elevated antibody titer is that she received immunizations [two-to-three] weeks before the initial symptom cluster began in mid[-]September of 2017." *Id.* "Today he specifically would like me to address his question of how we could remove any intramuscular repository of the [Tdap] vaccine she had received since he perceives that as long as that nidus remains present she will continue to make antibody producing her symptom cluster (sic)." *Id.* Dr. Nespeca again recommended an ultrasound to screen for "disorders that have a more compelling association with elevation of this antibody than do immunizations" and explained that he did not know how to remove any residual component of the vaccine that remained. *Id.* at 1685. He also advised Petitioner to continue her prednisone treatment. *Id.* Ultrasounds of Petitioner's kidney, bladder, and thyroid were completed on October 8, 2018, and did not reveal any abnormalities. *Id.* at 1722. Petitioner presented again to Dr. Sheets on October 10, 2018, and noted her symptoms had become less frequent since starting prednisone. *Id.* at 1772. He advised her to continue home schooling and to decrease her prednisone as her symptoms improved. *Id.* Petitioner

also underwent an EEG at the order of Dr. Nespeca on November 5, 2018, which was normal. *Id.* at 1872.

On December 12, 2018, Petitioner returned to Dr. Sheets for a follow-up. Pet'r's Ex. 3 at 1880. She reported that her symptoms had resolved and she planned to return to school next semester. *Id.* Dr. Sheets noted that "[t]iming of relapse with stress of school and improvement with low dose prednisone does raise concern for somatic component of symptoms." *Id.* He advised her to continue low dose prednisone and plan for a taper in two-to-three months. *Id.* Dr. Sheets also discussed the case with a social worker and the family and planned for a social worker to follow up. *Id.*

Petitioner returned to Dr. Sheets on March 6, 2019, for a follow-up visit after her symptoms began to flare again in the first week of January. Pet'r's Ex. 8 at 12. Her parents reported that she would have five spells in a row "lasting minutes with tremors and fainting and parallels." *Id.* Her parents reported that she was "very active" in December without any of these spells. *Id.* "[H]er symptoms [were] more random with shaking tremors and [EEG] was normal but she would have still random with weak or faint (sic). She has not been able to go to school." *Id.* Dr. Sheets planned to increase her prednisone to 10mg and repeat her encephalopathy panel. *Id.* at 15–16. He also reported that she would be seeing a pediatric neurologist at Loma Linda University Children's Hospital. *Id.* at 16. Her panel revealed an elevated antibody titer of 0.11 nmol/L. Pet'r's Ex. 7 at 10.

Petitioner then presented to Dr. Nespeca on March 9, 2019, where her father again repeated his belief that her symptoms were related to the Tdap vaccine she received. Pet'r's Ex. 8 at 21. Dr. Nespeca ordered a cerebrospinal fluid ("CSF") autoimmune panel and recommended Petitioner see an encephalitis expert for a second opinion. *Id.* at 25. Petitioner's CSF chemistry was normal and a lumbar puncture performed on March 11, 2019, revealed no abnormalities. *Id.* at 29; Pet'r's Ex. 7 at 3.

On April 30, 2019, Petitioner presented to pediatric neurologist Gregory Aaen at Linda Loma University Health. Pet'r's Ex. 9 at 7. Petitioner's parents repeated that Petitioner had received the Tdap vaccine two weeks prior to the start of her symptoms. *Id.* at 10. Dr. Aaen also noted that Petitioner's "waxing and waning of symptoms may appear to correlate with antibody titers." *Id.* After her examination, Dr. Aaen noted that he was "unable to identify a unifying neurological diagnosis for all of her myriad complaints." *Id.* at 12. He also noted that the fact one of her fainting episodes was "captured on video EEG and the EEG showed a normal awake background means that that specific event was psychogenic in etiology." *Id.* He also noted that he felt "many of her complaints are psychogenic in nature." *Id.* However, he did acknowledge that her antibody titers were mediating some of her symptoms due to her improvement on steroids. *Id.* He advised a trial dose of Cellcept and that Petitioner seek treatment for conversion disorder. *Id.* at 13. Petitioner returned to Dr. Sheets on June 5, 2019, and reported feeling "much better over the last [five] days with normal personality and no neurologic symptoms" after starting 500mg of Cellcept one month prior. Pet'r's Ex. 8 at 31. Dr. Sheets maintained her medication dosage and requested to see her again in two months. *Id.* at 35.

Petitioner followed up with Dr. Nespeca on June 28, 2019, and reported having no "attacks" since beginning Cellcept, though she did experience episodes of fatigue and dizziness.

12

Pet'r's Ex. 8 at 39. Petitioner was homeschooled during this time but was planning to start high school after the summer. *Id.* Petitioner's father stated that he was "upset with Dr. Aaen when he mentioned . . . the possibility of conversion disorder and said he never wanted to see that doctor again." *Id.* Dr. Nespeca also noted that the Mayo Clinic was unable to assay for the AChR antibody in Petitioner's CSF samples and that such a result would have greatly informed his diagnosis. *Id.* at 41. He deferred to Dr. Sheets with regard to Petitioner's continued course of medication. *Id.*

On July 25, 2019, Petitioner returned to Dr. Sheets for her two-month follow-up and reported that she had not experienced any symptoms aside from mild dizziness. Pet'r's Ex. 8 at 44. Petitioner was due to start high school in two weeks and planned to resume tennis. *Id.* Dr. Sheets noted that her June labs were normal and recommended she continue her prednisone and Cellcept, and to call if the stress of school caused her symptoms to flare again. *Id.* at 47.

On September 12, 2019, Petitioner returned to Dr. Nespeca with complaints of new episodes of symptoms over the past two weeks. Pet'r's Ex. 8 at 52. Petitioner reported that she had been doing "very well without relapse" until two weeks ago, when she began to experience "some brief episodes of vertigo and nearly lost consciousness." *Id.* She had not experienced any dizziness, weakness, or parestheias, and her parents expressed a concern this was a side effect of the Cellcept. *Id.* Dr. Nespeca noted her symptoms could be "related to her autoimmune encephalopathy or could be anxiety related to the starting of school." *Id.* at 56. He increased her dosage of Cellcept and advised her to follow up in two months. *Id.*

Petitioner presented to Dr. Sheets again on November 7, 2019, with complaints of nausea and new attacks that came as "jolts and altered state of consciousness episodes." Pet'r's Ex. 11 at 8. Petitioner had returned to homeschooling and "was much better for one week prior to about [five] days ago." *Id.* Dr. Sheets recommended stopping the Cellcept as he did not "think it [was] helping and [] add[ed] Prilosec 20mg" due to the nausea associated with her prednisone. *Id.* at 11. He also indicated he would speak to a neuroimmunologist at the Mayo Clinic "to see if they have been getting reports of false positive antibody tests" and consult next steps. *Id.*

On November 18, 2019, Petitioner presented to Dr. Nespeca following a video EEG "to capture what sounded like myoclonic jerks and collapsing episodes." Pet'r's Ex. 11 at 45. The video EEG recorded two episodes of collapsing, one episode of jerks, and one episode of trembling hands. *Id.* "None of these had any associated electroencephalographic seizure pattern. She remained aware during the collapse events and recalled what people were saying though she could not respond." *Id.* at 45–46. A repeat encephalopathy panel showed slightly less elevated AChR antibody levels of 0.06 nmol/L and high dose solumedrol and prednisone did not help. *Id.* at 46. She now reported collapsing five times per day. *Id.* Dr. Nespeca also noted his reluctance to order stronger treatment regimens due to the risk of side effects and that in his view it was "possible that her symptoms may in the future disappear as [he has] seen happen in other autoimmune disorders of neurological type even with no therapy." *Id.* at 48. Dr. Nespeca ultimately concluded that further EEG studies were unnecessary and agreed to stop both Cellcept and prednisone. *Id.* He also noted that Petitioner's HLA antibody test was negative and that she did not have the sleep stage characteristics for narcolepsy. *Id.* He asked her parents to provide him with an update in two months and to return to him in six months. *Id.* at 49.

Petitioner returned to Dr. Sheets on March 5, 2020, and reported doing well for a period of weeks off medication "but then ha[d] short episodes lasting seconds off and on during the day but [could] have no symptoms during the day." Pet'r's Ex. 59 at 55. Her symptoms included shaking spells, eye fluttering, and alteration of consciousness, with up to 12 spells per day. *Id.* She reported that Dr. Nespeca told her she could return to school if she could go three weeks without an episode, but she had only been able to be asymptomatic for two weeks. *Id.* Dr. Sheets noted that the family planned to have Petitioner see a psychotherapist for depression. *Id.* at 58. He also noted that the neuroimmunologist at the Mayo Clinic agreed that a more aggressive treatment regimen was not warranted and scheduled a follow-up for July. *Id.*

On April 20, 2020, Petitioner returned to Dr. Nespeca and reported that her symptoms had been more frequent over the last two weeks. Pet'r's Ex. 59 at 103. He noted that her "symptoms of paralysis, burning sensation of knees and ankles, chest pain and breathing problems, and 'jaw locking up'" had resolved since her initial presentation in 2018, but she continued to experience episodes of dizziness and loss of consciousness. *Id.* at 104. Petitioner's father requested another AChR antibody panel, but Dr. Nespeca declined until later in the fall. *Id.* Dr. Nespeca also explained that he did not believe any further pharmacotherapy treatments would be helpful and asked to reexamine Petitioner again in six months. *Id.* at 105.

Petitioner completed a behavioral health assessment on July 27, 2020, with Child Welfare Services at Rady Central Clinic. Pet'r's Ex. 58 at 7. The social worker reported that Petitioner was "presenting with symptoms of depression and anxiety following exacerbated (sic) by a medical condition. Specifically, at 12.5 years old, . . . [Petitioner] began experiencing physical symptoms . . . consistent with Autoimmune Encephalomyelitis following Tdap vaccine, per client." *Id.* at 8. "Client reported feeling scared before diagnosis, but since then she feels sad and anxious all the time . . . onset of depressive and anxious symptoms was 13.5 years old." *Id.* The social worker reported that Petitioner no longer had an interest in piano or tennis and had a "depressed mood on most days, excessive worries and rumination about past and future events, and social isolation." *Id.* The social worker further reported that Petitioner's "symptoms of depression and anxiety . . . appear related to her medical condition, and will be addressed using cognitive-behavioral therapy skills and mindfulness in treatment." *Id.* at 15. Petitioner continued psychotherapy until her discharge on September 17, 2020, where her therapist noted she was "engaging in pleasurable activities with friends on a daily basis, and reporting minimal depressive and anxiety symptoms that do not cause impairment in daily functioning." Pet'r's Ex. 70 at 47.

Petitioner returned to Dr. Sheets on August 12, 2020, and reported she was only able to go a few days without an episode. Pet'r's Ex. 59 at 146. Dr. Sheets suggested that Petitioner start Rituxan to treat her symptoms and to follow up in four months. *Id.* at 149.

On November 4, 2020, Petitioner presented to ophthalmologist Henry O'Halloran with complaints of headache and visual disturbance. Pet'r's Ex. 59 at 194. She reported that she had experienced dizziness, neck pain, and ear ringing for two weeks, as well as horizontal diplopia. *Id.* Dr. O'Halloran ordered a computed tomography ("CT") scan of her head to investigate. *Id.* at 196.

The next day, November 5, 2020, Petitioner followed up with Dr. Nespeca and reported her diplopia and headaches, which occur "almost every day." Pet'r's Ex. 59 at 240. Dr. Nespeca recommended Petitioner remove her braces so an MRI could be performed, as it would be "much

14

more likely to bear fruit than a head CT scan." *Id.* at 242. He also ordered a repeat of Petitioner's encephalopathy panel, which showed a mildly elevated AChR level of 0.07 nmol/L. *Id.*; Pet'r's Ex. 60 at 3. Petitioner underwent an MRI of her brain on November 19, 2020, which was "within normal limits, stable when compared to prior exam." Pet'r's Ex. 59 at 365.

Petitioner followed up with Dr. Sheets on December 2, 2020, who noted that "her symptoms have continued without any significant change." Pet'r's Ex. 59 at 446. Dr. Sheets noted his agreement with Dr. Nespeca to start IVIG treatment and noted a new pediatric inflammatory brain disease clinic that may be helpful in Petitioner's case. *Id.* at 450. The following day, on December 3, 2020, Petitioner returned to Dr. Nespeca, who noted he had reviewed a "case of an adult with very high titer antibody to nicotinic receptor who had a 20-year history of severe hypotension, gastrointestinal dysmotility, sicca syndrome, and severe urinary and ejaculatory dysfunction." *Id.* at 496. He noted that other cases of autonomic failure had "similar but milder symptoms." *Id.* Petitioner was still attending online classes but still could only do limited exercise. *Id.* Dr. Nespeca referred to Petitioner's impression as a "mysterious disabling panoply of symptoms . . . and which is associated with consistently elevated serum antibody to alpha 3 ganglionic nicotinic Acetylcholine receptor and mildly elevated sed rate." *Id.* at 497. He noted her working diagnosis to be "autoimmune neurologic disorder on broad spectrum of encephalomyelitis (sic)." Dr. Nespeca noted that Petitioner did "not have typical symptoms or signs of autonomic failure which [have] been associated with elevation of this antibody," but still opined that "this could be playing a role in her symptomatology now and in the past." *Id.* at 498. He also expressed his skepticism that "this is a psychosomatic problem for her since she has seemed to [him] over the 2.5 years [he had] seen her to be a kid motivated to get back to normal life." *Id.* He also noted that she had "no features of any clear DMS V diagnosis" during an October 2019 psychiatric consultation. *Id.* Dr. Nespeca ordered Petitioner to begin IVIG therapy and requested her to follow up in three months. *Id.* Petitioner and her family declined to pursue IVIG therapy. Pet'r's Ex. 88 at 6.

On August 25, 2021, Petitioner returned to Dr. Sheets and continued to describe daily episodes of weakness and loss of consciousness. Pet'r's Ex. 67 at 411. Petitioner's father requested she start plasmaphereses "with the idea that it would scrub the antibody associated with her disease," which he expressed was due to the Tdap vaccine. *Id.* Dr. Sheets explained the "significant risks" of plasmaphereses and that there was "no evidence in literature it would help her disease and would not necessarily be associated with a decrease in her antibody vs IVIG as a potential therapy option." *Id.* at 411–12. He instructed Petitioner to follow up with neurology and follow up with himself as needed. *Id.* at 415.

Petitioner presented to Dr. Nespeca again on November 18, 2021, who noted that Petitioner had declined to pursue IVIG therapy because she "hoped things would improve on its own." Pet'r's Ex. 88 at 6. Petitioner reported she was experiencing episodes as frequently as twice per week and also that "a friend told her that her doctors should include atonic seizures as a possible cause of her episodes." *Id.* at 7. However, Dr. Nespeca noted that there was no associated seizure pattern on Petitioner's video EEG. *Id.* Dr. Nespeca's impression was that Petitioner had improved despite a lack of treatment since her last visit 11 months ago and recommended she follow up as needed. *Id.* at 9.

15

On April 6, 2023, Petitioner returned to Dr. Sheets with continued complaints of dizziness and loss of consciousness episodes. Pet'r's Ex. 88 at 31. Dr. Sheets opined that he "did not think that her symptoms were consistent with a conversion reaction or other psychosomatic disease given her course" and her antibody titers. *Id.* He also noted that inpatient psychiatry "did not feel this had a emotional basis." *Id.* Dr. Sheets noted that Petitioner had "gradually improved . . . but did have several episodes last fall every other day for weeks" and was unable to drive due to the spells." *Id.* at 30–31. He noted that Petitioner now complained of redness in her cheeks and "intermittent warm and cold hands" but that she had no other symptoms to suggest systemic lupus erythematosus ("SLE"). *Id.* at 31. Dr. Sheets ordered labs to check for SLE and instructed Petitioner to follow up with dermatology. *Id.* at 34. He also recommended Petitioner see neuroimmunologist Jennifer Grave for another opinion. *Id.*

No other relevant medical records were filed.

### III.    Affidavit of Petitioner's Mother, Brenda Antoniades

On June 4, 2020, Petitioner's mother, Brenda Antoniades, filed a brief affidavit. Pet'r's Ex. 13. Ms. Antoniades stated that prior to Petitioner's August 2017 Tdap vaccination she was "extremely active and healthy" and an active tennis player. *Id.* at ¶ 1. She also stated she was an honors student who enjoyed school and was in the Girl Scouts. *Id.* at ¶¶ 3–4. Petitioner's mother stated that "[w]ithin a short time after receiving the Tdap vaccine, [Petitioner] began to complain about unexplained pain in her legs and paresthesia." *Id.* at ¶ 6. "Shortly thereafter [ Petitioner] was unable to stand and walk on her own," with the condition progressing to her "hands, fingers, face, jaw, and mouth." *Id.* Because of these symptoms, Ms. Antoniades stated Petitioner was unable to attend school and placed on an independent study program. *Id.* at ¶ 7. She stated that in October 2017 Petitioner began to "lose consciousness and go limp" several times per day. *Id.* at ¶ 8. Due to the frequency of her episodes, Ms. Antoniades reported that Petitioner was unable to attend online classes with an attendance requirement, and instead had to use a more flexible schedule program. *Id.* at ¶ 9. She stated that after several months Petitioner "was diagnosed with autoimmune encephalomyelitis/encephalitis/encephalopathy based on Mayo Clinic testing results." *Id.* at ¶ 10. She noted that Petitioner was off of medication due to a lack of progress. *Id.* at ¶ 11.

### IV.    Experts

#### A. Expert Qualifications

##### 1. Petitioner's Expert, Dr. Mahbubul Huq, M.B.B.S., Ph.D.

Dr. Huq is a board-certified pediatric neurologist and clinical geneticist at Children's Hospital of Michigan and a Professor of Pediatrics at Central Michigan University. Pet'r's Ex. 14 at 1. He received his M.B.B.S. from Dhaka University Medical College in Bangladesh and his Ph.D. in Philosophy from Tokushima University. Pet'r's Ex. 15 at 1. He completed his internship at Dhaka University and his residencies in pediatrics and neurology at Wayne State University. *Id.* at 1–2. He also completed fellowships in medical genetics and pediatric neurology at Wayne State University, Baylor College of Medicine, and the University of British Columbia. *Id.* at 1. Dr. Huq

has "treated many patients with autoimmune encephalitis in both inpatient and outpatient settings." Pet'r's Ex. 14 at 1.

### 2. Respondent's Expert, Dr. Eric Lancaster, M.D., Ph.D.

Dr. Lancaster is an "academic neurologist with expertise in antibody-mediated neurologic disorders" and is a board-certified neurologist. Resp't's Ex. B at 1. He received his M.D. and Ph.D. in neuroscience from the University of Maryland. *Id.* He completed his internship, neurology residency, and fellowships in neuromuscular research at the Hospital of the University of Pennsylvania, where he currently serves as an Assistant Professor of Neurology. *Id.* Dr. Lancaster has published several articles relating to antibody-mediated neurological disorders, to include encephalitis and peripheral nerve hyperexcitability. *Id.* His lab work is "focused on detection of neuronal autoantibodies, particularly in the context of autoimmune encephalitis and paraneoplastic disorder." Resp't's Ex. A at 1. His clinical practice is "focused on autoimmune neurological diseases." *Id.*

### B. Expert Reports and Testimony

### 1. Dr. Huq's Initial Report[13]

Dr. Huq began his analysis by stating Petitioner suffered from "[Tdap] vaccination induced autoimmune encephalopathy associated with elevated alpha 3 ganglionic nicotinic receptor antibody leading to various sensory, autonomic and psychiatric symptoms as well as unexplained spells." Pet'r's Ex. 14 at 2. He explained that autoimmune encephalopathies are "more complex disorders characterized by subacute development in days to weeks . . . [and] may also present in an atypical way with isolated features or variable symptoms." *Id.* (citing Pet'r's Ex. 33;[14] Pet'r's Ex. 34;[15] Pet'r's Ex. 38;[16] Pet'r's Ex. 52;[17] Pet'r's Ex. 53).[18] Autoimmune encephalopathies may be "associated with antibodies against cell surface proteins . . . [or] antibodies binding intracellular antigens." *Id.* He explained that such antibodies are "likely markers of a T-cell mediated process" which are treated with immunosuppressant therapies. *Id.* at 2–3. He also opined that "[i]t is almost certain that many other forms of autoimmune encephalopathy associated with other antibodies or immune mechanisms remain to be identified." *Id.* at 3.

Turning to Petitioner, Dr. Huq opined that her clinical course was "consistent with autoimmune encephalopathy that has been described in patients with ganglionic [AChR]

---

[13] Throughout both his reports and his testimony Dr. Huq uses the terms "autoimmune encephalopathy" and "autoimmune encephalitis" interchangeably. Because these are distinct conditions and because I cannot ascertain which Dr. Huq is intending to refer to at a given moment, I will refer to whichever condition Dr. Huq has listed in a given instance.

[14] Eoin P. Flanagan et al., *Autoimmune Dementia and Encephalopathy*, 133 HANDBOOK CLINICAL NEUROLOGY 247 (2016).

[15] F. Graus et al., *Recommended Diagnostic Criteria for Paraneoplastic Neurological Syndromes*, 75 J. NEUROLOGY NEUROSURGERY PSYCHIATRY 1135 (2004).

[16] Matthew S. Kayser et al., *Psychiatric Manifestations of Paraneoplastic Disorders*, 167 AM. J. PSYCHIATRY 1039 2010).

[17] Steven Vernino et al., *Autoimmune Encephalopathies*, 13 THE NEUROLOGIST 140 (2007).

[18] Angela Vincent et al., *The Growing Recognition of Immunotherapy-Responsive Seizure Disorders With Autoantibodies to Specific Neuronal Proteins*, 23 CURRENT OP. NEUROLOGY 144 (2010).

antibody." Pet'r's Ex. 14 at 3 (citing Pet'r's Ex. 40).[19] McKeon et al. was a Mayo Clinic study analyzing the presence of AChR antibodies as a potential marker for neurologic autoimmunity and cancer. Pet'r's Ex. 40 at 1. The authors explained that the α3-AChR autoantibody "causes autoimmune dysautonomia[20] that is either subacute or insidious in onset" and that a "direct relationship between antibody titer and severity of dysautonomia occurs in both experimental animals and patients." *Id.* at 2. Patients with high levels of the α3-AChR antibody (>1.0 nmol/L) often developed "profound pandysautonomia," while patients with lower levels of α3-AChR antibody developed limited dysautonomia, to include "[POTS] or gastroparesis." The authors analyzed 15,000 patients, with 1% testing seropositive for AChR antibodies. *Id.* at 1. Of the positive results (greater than 0.02 nmol/L), the median result was 0.12 nmol/L and the median age was 65 years. *Id.* Twelve patients had high antibody values ("ABV") (>1.0 nmol/L), 85 patients had medium ABV (0.10–0.99 nmol/L), and 58 patients had low ABV (0.03–0.09 nmol/L). *Id.* at 4–5. Eleven of the high ABV patients (92%) were considered to have a neurologic disorder with an autoimmune pathogenesis and 10 (84%) had dysautonomia. *Id.* at 4.

Patients with medium ABV had a more diverse group of symptoms, with the predominant presentation being peripheral neuropathy (36%). Pet'r's Ex. 40 at 4. Other presentations included dysautonomia (20%), limited dysautonomia (16%), coexisting sensorimotor neuropathy (7%), and neurophysiological evidence of a distal small fiber neuropathy (6%). Eleven patients (13%) also had "acute or subacute onset of cognitive and psychiatric symptoms and signs such as depression, psychosis, executive dysfunction, personality change, and amnestic mild cognitive impairment." *Id.* Only one patient had inflammatory CFS markers, which improved following intravenous steroids. *Id.* at 5. Ultimate diagnoses included non-immune-mediated neurological disorder (13%), a nonneurological disorder (6%), MS (3.5%), and single cases of stiffman syndrome and myasthenia gravis. *Id.* Patients with a low ABV had a median value of 0.06 nmol/L, and 54% had either a non-immune-mediated neurological disorder or a nonneurological disorder. *Id.* Peripheral neuropathy was the predominant neurological manifestation (22%), followed by dysautonomia (10%). *Id.* Three patients were identified with subacute neuropsychiatric presentations, to include a case of limbic encephalitis with coexisting ANNA-1 autoantibody and two with subacute memory loss and depression. *Id.* With regard to objective testing and imaging, 63% of tested patients had CSF abnormalities and only four out of 80 had abnormal MRI imaging. *Id.* Of the 16 patients who received immunotherapy, 12 showed improvement. *Id.*

McKeon et al. alsoobserved that "clinical suspicion for an autoimmune etiology as the basis of the neurological presentation was directly proportional to the antibody titer." Pet'r's Ex. 40 at 7. Specifically, the authors highlighted that of patients with low α3-AChR ABV values, "54% had non-specific symptoms without a neurological diagnosis." *Id.* They highlighted the presence of dysautonomia amongst seropositive patients, noting that their laboratory had previously observed 14.6% of POTS patients registered low α3-AChR ABV. *Id.* "Peripheral neuropathy was the most common accompaniment of α3-AChR [antibodies], document[ed] in 28% of patients." *Id.* CNS manifestations occurred in 20% of patients, with most of these patients experiencing neuropsychiatric manifestations or extrapyramidal disorders. *Id.* Dr. Huq opined that these findings were consistent with Petitioner's presentation given her elevated α3-AChR ABV. Pet'r's Ex. 14 at 3.

---

[19] Andrew McKeon et al., *Ganglionic Acetylcholine Receptor Autoantibody: Oncological, Neurological, and Serological Accompaniments*, 66 ARCHIVES NEUROLOGY 735 (2009).

[20] Dysautonomia is the "malfunction of the autonomic nervous system." *Dysautonomia*, DORLAND'S.

Dr. Huq also noted that Petitioner's treating physicians, Dr. Sheets and Dr. Nespeca, diagnosed her with autoimmune encephalopathy. Pet'r's Ex. 14 at 3. "Although some of [Petitioner's] treating physicians have raised the possibility of a conversion disorder, it is important to recognize that conversion or somatoform disorders are not malingering but are brain disorders with unknown pathophysiology." *Id.* (citing Pet'r's Ex. 18;[21] Pet'r's Ex. 19).[22] However, from his review of Petitioner's medical record, Dr. Huq "did not identify a psychosocial cause for her symptoms." *Id.* He also highlighted Dr. Nespeca's note from Petitioner's initial presentation to him on March 8, 2018, where he opined that Petitioner did not seem to fit the "typical profile" of a conversion disorder patient. *Id.* (citing Pet'r's Ex. 3 at 1061). He further argued that Petitioner's lack of response to steroids was not indicative of conversion disorder, as Petitioner "initially responded to prednisone," and her later limited responses were "not unusual as not everyone with autoimmune encephalopathy and elevated [α3-AChR] responds to immunotherapy." *Id.* (citing Pet'r's Ex. 40).

Dr. Huq then turned to describing α3-AChR as "a neuronal nicotinic neurotransmitter receptor subunit present in peripheral sympathetic ganglion and various brain regions." Pet'r's Ex. 14 at 3. He cited to Yeh et al.,[23] which showed the presence of α3-AChR in rat brains, and claimed that other studies had found patients with elevated α3-AChR presented with "autoimmune ganglionopathy or neuropathy but an overrepresentation of psychiatric and sensory symptoms." *Id.* at 4 (citing Pet'r's Ex. 56; Pet'r's Ex. 40; Pet'r's Ex. 42).[24] Given that patients with low α3-AChR ABV had more psychiatric and neurologic disorders than dysautonomia, Dr. Huq opined that this could be due to the "[b]inding of the antibody to the brain regions important in conversion or somatoform disorders or co-occurrence of other antibodies or autoimmune T-cells targeted against antigens located in those regions." *Id.* (citing Pet'r's Ex. 16).[25] Baker et al. was a case study reporting the case of a 47-year-old woman with an α3-AChR ABV of 2060 pmol/L (2.06 nmol/L) who presented with dysautonomia and later developed encephalitis visible via MRI, but had normal cognition. Pet'r's Ex. 16 at 1–3. The authors noted the "pathogenic" nature of α3-AChR antibodies that often reside in patients with subacute pan-autonomic failure, but could not determine whether these antibodies were the cause of this patient's encephalitis. *Id.* at 3.

> Given the detection of antibody binding to both CNS α4 and α7 nAChR, it is tempting to speculate that these may have precipitated the symptoms of brain stem encephalitis. However, serum testing was performed on her initial sample and we therefore cannot establish that these antibodies were present at the time of her encephalopathy.

---

[21] Markus Boeckle et al., *Neural Correlates of Conversion Disorder: Overview and Meta-Analysis of Neuroimaging Studies on Motor Conversion Disorder*, 16 BMC PSYCHIATRY 195 (2016).

[22] Marcus Boeckle et al., *Neural Correlates of Somatoform Disorders From a Meta-Analytic Perspective on Neuroimaging Studies*, 11 NEUROIMAGE: CLINICAL 606 (2016).

[23] Jenny Yeh et al., *Neuronal Nicotinic Acetylcholine Receptor α3 Subunit Protein in Rat Brain and Sympathetic Ganglion Measured Using a Subunit-Specific Antibody: Regional and Ontogenic Expression*, 77 J. NEUROCHEMISTRY 336 (2001).

[24] Petitioner originally did not file an article for Exhibit 42 and instead filed a single page for this exhibit which read "Petitioner has requested a copy of this article and will file upon receipt." *See* Pet'r's Ex. 42, ECF No. 31-9. Petitioner later filed only the abstract of this article. *See* Pet'r's Ex. 42, ECF No. 75.

[25] S.K. Baker et al., *Autoimmune Autonomic Ganglionopathy With Late-Onset Encephalopathy*, 146 AUTONOMIC NEUROSCIENCE: BASIC & CLINICAL 29 (2009).

*Id.* The authors also noted the depletion of α4 and α7 nAChR in Alzheimer's patients, "suggesting that targeted autoimmunity against these receptors may impair neurocognitive function." *Id.* Dr. Huq further suggested that Petitioner's α3-AChR may instead be indicative of "autoimmunity rather than having a direct pathogenic role in producing" all of her symptoms. Pet'r's Ex. 14 at 4.

According to Dr. Huq, the Tdap vaccine "stands out as the only identified environmental factor to trigger her autoimmune encephalopathy." Pet'r's Ex. 14 at 4. He acknowledged Petitioner's development of a febrile illness three weeks after vaccination, but stated that whether such an infection "represents the onset of an autoimmune condition or represents a viral infection is not known," though infections have been linked to autoimmune encephalitis. *Id.* (citing Pet'r's Ex. 51).[26] However, he then stated that "[v]accines may trigger autoimmunity using similar mechanisms and in fact, Tdap vaccine and a viral infection may have acted synergistically to produce the autoimmune encephalopathy." *Id.* "Although there is no previous report of association of TdaP vaccine with autoimmune encephalopathy with elevated [α3-AChR] antibody, TdaP has been associated with other autoimmune conditions including immune mediated encephalitis." *Id.* Dr. Huq then proceeded to cite to examples of other vaccines causing unrelated autoimmune diseases[27] and noted that Pellegrino et al.[28] found Tdap to be the fourth-most commonly associated vaccine with the development of acute disseminated encephalomyelitis ("ADEM") in the VAERS database. *Id.* (citing Pet'r's Ex. 45). He also cited to Hofmann et al.,[29] a case report identifying the development of anti-NMDA receptor encephalitis following Tdap vaccination. *Id.* at 5 (citing Pet'r's Ex. 36).

Turning to this theory of causation, Dr. Huq first noted the importance of genetic predisposition in the development of autoimmune conditions. Pet'r's Ex. 14 at 5. He then provided seven potential mechanisms by which the Tdap vaccine could trigger autoimmunity: "cytokine production, anti-idiotype network, expression of human HLA, molecular mimicry, bystander action, epitope spreading and polyclonal activation of B cell." *Id.* (citing Pet'r's Ex. 30).[30] However, of these mechanisms, he opined that "molecular mimicry between tetanus toxoid and human beta-2glycoportein I is a likely mechanism, but . . . [a] variety of other mechanisms may be involved." *Id.* Dr. Huq then went on to explain the role of molecular mimicry in the development of antiphospholipid syndrome ("APS") following tetanus toxoid immunization in mice. *Id.* (citing Pet'r's Ex. 31).[31] Due to three-dimensional similarity and short-sequence homology to human beta 2-glycoprotein I and laminin proteins, "[t]his structural similarity favors the role of tetanus toxoid

---

[26] Arun Venkatesan & David Benavides, *Autoimmune Encephalitis and Its Relation to Infection*, 15 CURRENT NEUROLOGY NEUROSCIENCE REP. 4 (2015).

[27] These vaccines include those for yellow fever, swine flu, hepatitis B, hemophilus, flu, human papilloma virus, and hepatitis A. Dr. Huq does not explain how these studies showing a potential association between these vaccines and autoimmunity pertains to the development of autoimmune encephalopathy via the Tdap vaccine.

[28] Paolo Pellegrino et al., *Acute Disseminated Encephalomyelitis Onset: Evaluation Based on Vaccine Adverse Events Reporting Systems*, 8 PLoS ONE 77766 (2013).

[29] Caroline Hofmann et al., *Anti-NMDA Receptor Encephalitis After TdaP-IPV Booster Vaccination: Cause or Coincidence?*, 258 J. Neurology 500 (2011).

[30] M. De Martino et al., *Vaccines and Autoimmunity*, 26 INT'L J. IMMUNOPATHOLOGY & PHARMACOLOGY 283 (2013).

[31] L. Dimitrijevic et al., *Vaccine Model of Antiphospholipid Syndrome Induced by Tetanus Vaccine*, 21 LUPUS 195 (2012).

in autoimmunity, with molecular mimicry as the mechanism." *Id.* (citing Pet'r's Ex. 49).[32] He explained that tetanus toxoid produced anti-beta 2-glycoprotein I antibodies, which "bind to the central nervous system, suggesting it may have a direct role in [CNS] symptoms of [APS]." *Id.* He then opined that this "may also be relevant in [Petitioner's] case." *Id.*

Turning to the logical sequence of cause and effect, Dr. Huq largely repeated verbatim his opinion as to Petitioner's diagnosis and his earlier opinions regarding potential causation. *See* Pet'r's Ex. 14 at 6. He added that while vaccines may trigger autoimmunity via similar mechanisms as infections, the "timing ([three] weeks between Tdap and encephalopathy versus just days between febrile illness and encephalopathy symptoms) favors vaccination as the trigger." *Id.*

On the issue of timing specifically, Dr. Huq noted that Petitioner had no symptoms prior to vaccination and that a study of the kinetics of the Tdap vaccination in women "showed that IgG and IgA levels peaked by day 14." Pet'r's Ex. 14 at 6 (citing Pet'r's Ex. 35).[33] Dr. Huq also extrapolated a window of acceptable timing from other immune-mediated conditions following infection and immunization, pointing to the onset of ADEM ("a few days to few weeks after an infection or immunization"), GBS following influenza vaccination ("a few days to weeks after vaccination"), and ADEM and multiple sclerosis following HPV vaccination ("within a month after vaccination"). *Id.* (citing Pet'r's Ex. 45; Pet'r's Ex. 44;[34] Pet'r's Ex. 20;[35] Pet'r's Ex. 55).[36] "Thus, the timing is consistent with an autoimmune encephalopathy triggered by Tdap vaccination." *Id.*

### 2. Dr. Lancaster's Initial Report

Dr. Lancaster began his analysis by discussing the role of AChR antibodies and their clinical associations. Resp't's Ex. A at 6. He explained that "[a]cetylcholine is a neurotransmitter that is commonly present in the central and peripheral nervous systems" and is critical to the connection between nerve and muscle tissue, as well as the regulation of the autonomic nervous system. *Id.* He noted that there are multiple different types of AChRs throughout the nervous system, "each with a particular localization and function." *Id.* One of these receptors is the ganglionic AChR ("gAChR"), which primarily uses the α3-AChR subunit and controls blood pressure, urination, heart rate, and other autonomic functions. *Id.* at 7.

Dr. Lancaster also noted that autoimmunity to other AChR receptors found in neuromuscular junctions result in the development of myasthenia gravis. Resp't's Ex. A at 7. With

---

[32] Marijana Stojanovic et al., *The Context of Tetanus Toxoid Application Influences the Outcome of Antigen-Specific and Self-Directed Humoral Immune Response*, 53 MICROBIOLOGY IMMUNOLOGY 89 (2009).

[33] B.A. Halperin et al., *Kinetics of the Antibody Response to a Tetanus-Diphtheria-Acellular Pertussis Vaccine in Women of Childbearing Age and Postpartum Women*, 53 CLINICAL INFECTIOUS DISEASES 885 (2011).

[34] Yong-Shik Park et al., *Clinical Features of Post-Vaccination Guillain-Barré Syndrome (GBS) in Korea*, 32 J. KOREAN MED. SCI. 1154 (2017).

[35] R. Bomprezzi & B. Wildemann, *Acute Disseminated Encephalomyelitis Following Vaccination Against Human Papilloma Virus*, 74 NEUROLOGY 864 (2010).

[36] B. Wildemann et al., *Acute Disseminated Encephalomyelitis Following Vaccination Against Human Papilloma Virus*, 72 NEUROLOGY 2132 (2009).

this in mind, Vernino & Lennon[37] developed an assay to detect gAChR antibodies and found that approximately 50% of patients with subacute autoimmune autonomic neuropathy ("AAN") tested positive for gAChR binding antibodies. *Id.* (citing Resp't's Ex. A, Tab 1). The authors noted that these antibodies were not found in healthy control subjects and that "[a]mong patients with acquired dysautonomia, seropositivity is highly associated with the diagnosis of idiopathic or paraneoplastic autonomic neuropathy." Resp't's Ex. A, Tab 1 at 2. They also noted that while the majority of patients expressed high ABV (>0.2 nmol/L), about 10% of patients with limited AAN had levels between 0.05 and 0.20 nmol/L and presented with such as gastrointestinal dysmotility, diabetic autonomic neuropathy, and POTS. *Id.* at 2–3.  Dr. Lancaster also cited to McKeon et al. and argued "results below 0.10 units are thought to generally not be significant, and could be found in persons with diverse problems, most of which are not clearly autoimmune nor autonomic." Resp't's Ex. A at 7 (citing Pet'r's Ex. 40). He then referenced the various symptoms discussed by McKeon et al. and argued the paper supported the proposition that "the antibodies most likely do not cause most of these problems." *Id.* The antibodies, according to Dr. Lancaster, "do not target the type of receptors expressed to a significant degree in the brain. Rather, this may reflect the types of patients referred for paraneoplastic testing in general." *Id.*

The antibodies themselves are only significant in the context of autonomic failure, according to Dr. Lancaster, and are otherwise "not useful for diagnosing human disease." Resp't's Ex. A at 8. He argued that "low titer results do not have a clear diagnostic significance," and that any such association of non-autonomic symptoms with medium and low titer levels was "undercut by the incredibly strong association of high titer antibodies with autonomic failure." *Id.* He explained that if such lower levels could cause encephalitis, he would expect to see encephalitis in patients with higher titers, but instead these patients had fewer instances of encephalitis. *Id.* "The McKeon [et al.] paper therefore strongly favors the idea that gAChR antibodies are associated with AAN but that the test is imperfect and lower titer results or results associated with other phenotypes should be regarded with suspicion. *Id.* In his private practice, Dr. Lancaster has treated about 20 patients with positive gAChR testing, which he claimed is "almost always a 'junk' result, a false positive," and typically below 1.00 nmol/L. *Id.* He asserted that these patients did not have autonomic failure or evidence of autoimmune neurologic disorders, and thus "[l]ow titer results should therefore be regarded with suspicion as a mechanism of disease in general, and especially outside the context of autonomic failure." *Id.*

In support of this assertion, Dr. Lancaster cited to Ebright et al.,[38] which conducted a review of the Mayo Clinic's paraneoplastic autoantibody testing to determine the rate of false positives, including those for gAChR. Resp't's Ex. A, Tab 3 at 1. The authors defined four categories a test result could fall into: a true positive, a false positive, a true negative, and a false negative. *Id.* at 2. A true positive was defined as any ABV higher than the normal range with no other clinical explanation and the satisfaction of at least one of the following: "the syndrome is known to be associated with the antibody, clinical improvement with immunosuppression or tumor treatment, or a new malignancy was found." *Id.* If none of the criteria were met or if another explanation was found, the result was deemed a false positive. *Id.* To determine if the criteria were met, the authors "performed detailed medical chart analysis" of each patient following their

---

[37] Steven Vernino & Vanda Lennon, *Neuronal Ganglionic Acetylcholine Receptor Autoimmunity*, 998 ANN. N.Y. ACAD. SCI. 211 (2003).

[38] Matthew Ebright et al., *Unintended Consequences of Mayo Paraneoplastic Evaluations*, 91 NEUROLOGY 2057 (2018).

antibody testing. *Id.* 500 panels were reviewed, and the gAChR antibody was the fourth most-common positive result with 15 positive tests, 86% of which met the authors' standard for a false positive. *Id.* at 4. Specifically, the authors explained that gAChR "antibodies are frequently false positive and have comparable positive rates in populations with neurologic symptoms, healthy controls, and neurologically asymptomatic patients with cancer." *Id.* at 8. They also noted the decline in the specificity of neurological presentation was related to a similar decline in gAChR titer level. *Id.* Using these results, Dr. Lancaster concluded that "[o]utside the context of a medium-strong positive result in a patient with profound dysautonomia, [the gAChR ABV] is not useful for diagnosing human disease." Resp't's Ex A at 8. He also stated there was "no evidence that vaccination causes gAChR antibodies." *Id.*

On the issue of Petitioner's diagnosis, Dr. Lancaster disagreed with Dr. Huq that Petitioner suffered from autoimmune encephalopathy. Resp't's Ex. A at 8. He noted that "no physiological cause" of her symptoms could be identified, evidenced by her normal neurological examinations, cardiac examinations, and the recording of her episodes on video EEG without a seizure pattern. *Id.* at 8–9. Instead, Dr. Lancaster believed conversion disorder to be the most likely diagnosis for Petitioner, as expressed by several of her providers. *Id.* at 9. Dr. Lancaster specifically found it "notable that [Petitioner's] exacerbations seemed to correlate with starting (or resuming) school." *Id.* He noted that prior to her elevated α3-AChR results, her providers believed Petitioner had a psychological issue, but opined that "it is unlikely these symptoms had an organic etiology or any connection to the gAChR antibody test." *Id.* In addition to his argument regarding false positives, Dr. Lancaster explained that these antibodies "target a synaptic receptor in autonomic ganglia," and that no signs of autonomic dysfunction, such as blood pressure regulation, heart rate, or pupillary constriction, were present in Petitioner. *Id.* "The antibodies should not affect thinking and cognition. The antibodies should not cause unexplained decreased responsiveness, numbness of the extremities, attacks of unexplained paralysis of the limbs, or most of [Petitioner's] main symptoms." *Id.*

Dr. Lancaster also argued that there was no evidence Petitioner suffered from autoimmune encephalitis, as her symptoms would have produced abnormalities captured by the EEG if they resulted from an encephalitis, in addition to "other objective findings". Resp't's Ex. A at 9. Because this diagnosis appeared to rest on Petitioner's gAChR antibody tests, Dr. Lancaster believed this diagnosis to be "in error," and that Petitioner should have been treated for conversion disorder instead of starting steroids. *Id.*

With regard to Dr. Huq's report, Dr. Lancaster disagreed with several of his conclusions. Resp't's Ex. A at 10. First, he opined that the link between gAChR antibodies and autoimmune encephalitis was "very unlikely to be causal, but rather reflects the types of patients studied at the Mayo clinic in their case series." *Id.* He stated this was because patients "with encephalitis may frequently have the panel sent, so patients with encephalitis will inevitably be represented among the patients with false positive results." *Id.* "If the Mayo [] panel were frequently sent on patients with ingrown toenails there might have been an apparent association of gAChR antibodies with that disorder." *Id.* He argued that the primary antigen, α3-AChR, resided on autonomic ganglia and not the brain, "[s]o invoking gAChR antibodies as some kind of mechanism is not correct." *Id.* He also pointed to a quote from the McKeon et al. article, which read "it is unlikely that the [α3-AChR] subunit is the primary autoantibody target in all the neurologic presentations described in this article." *Id.*

Second, Dr. Lancaster disagreed with Dr. Huq's theory that molecular mimicry between a component of the Tdap vaccine and the gAChR antibodies caused Petitioner's symptoms. Resp't's Ex. A at 10. He argued that Dr. Huq had not presented any specific component of the Tdap vaccine as a mimic and "was unable to provide any evidence that such mimicry occurs." *Id.* He also noted that Dr. Huq did not provide any evidence regarding his six other potential theories of causation. *Id.* Further, Dr. Lancaster did not agree with Dr. Huq's use of tetanus toxoid and human beta-2 glycoprotein I to cause APS as a proper mechanisms, as "this case has nothing to do with autoantibodies to human beta-2 glycoprotein [I], so . . . it would not explain the gAChR antibodies or [Petitioner's] symptoms." *Id.*

Third, Dr. Lancaster noted contradictions in Dr. Huq's discussion of conversion disorder. Resp't's Ex. A at 10. Specifically, he referred to Dr. Huq's theory as "a paradoxical entity of autoimmune conversion disorder." *Id.* "Petitioner's brief attacks of altered mentation with normal EEG are not consistent with organic encephalitis." *Id.* Dr. Lancaster also opined that there was no scientific evidence to favor either the Tdap vaccine or her febrile illness as the cause of her condition and that there were no reports of the Tdap vaccine causing gAChR antibodies to appear. *Id.*

### 3. Dr. Huq's Supplemental Reports

Dr. Huq began his first supplemental report by citing to Graus et al.[39] to provide a diagnostic criteria for "autoimmune encephalopathy:"[40]

1. Subacute onset (rapid progression of less than 3 months) of working memory deficits (short-term memory loss), altered mental status, or psychiatric symptoms

2. New focal CNS findings

3. Reasonable exclusion of alternative cause

Pet'r's Ex. 61 at 1 (citing Pet'r's Ex. 65). He noted that "not all cases of autoimmune encephalopathy" will meet these criteria, but asserted that Petitioner's presentation did. *Id.* He argued that Petitioner's dizziness and fainting were suggestive of dysautonomia and that Petitioner's other symptoms were "symptoms of encephalitis." *Id.* at 2.

Dr. Huq repeated his assertion that Petitioner did not have conversion disorder and cited to Dr. Nespeca's comments doubting a conversion diagnosis. Pet'r's Ex. 61 at 2 (citing Pet'r's Ex. 3 at 1061; Pet'r's Ex. 59 at 497). He also noted that Petitioner had multiple instances of an elevated sed rate. *Id.* Dr. Huq argued it was possible that Petitioner's EEG was normal because her symptoms were arising from "abnormalities of subcortical structures in which EEG would be normal." *Id.* at 3.

---

[39] Francesc Graus et al., *A Clinical Approach to Diagnosis of Autoimmune Encephalitis*, 15 NEUROLOGY 391 (2016). Dr. Lancaster is listed as one of the authors of this article.

[40] Dr. Huq stated this is a criteria for "autoimmune encephalopathy" in his report; however, the article discusses the diagnostic criteria of autoimmune encephalitis. *See* Pet'r's Ex. 65.

In explaining his theory of causation, Dr. Huq commented that he was "not suggesting that there is any known molecular mimicry between any component of [Tdap] and the ganglionic nicotinic cholinergic receptor or that mimicry between tetanus toxoid and human beta-2 glycoprotein I is the mechanism in this case, but that evidence indicates that [Tdap] can produce autoimmunity." Pet'r's Ex. 61 at 3. According to Dr. Huq, Petitioner's febrile illness was a symptom of her condition and not the cause, as "[o]ne would expect a few weeks delay between a trigger and autoantibody production thus making an infection causing her febrile illness an unlikely trigger in this case." *Id.*

Turning to the presence of α3-AChR antibodies in Petitioner, Dr. Huq contested Dr. Lancaster's assertion that these are only located in autonomic ganglia, citing to McKeon et al., which found α3-AChR to also be present in "sensory dorsal root ganglia, trigeminal ganglia, and in rat and mouse brains." Pet'r's Ex. 61 at 4 (citing Pet'r's Ex. 40). He also cited to Whiteaker et al.,[41] which identified α3-AChR in mouse brains. *Id.* (citing Pet'r's Ex. 66). In rats, Yeh et al. found α3-AChR in the interpeduncular nucleus, pineal gland, habenula and superior colliculi, and cerebral cortex, hippocampus, and cerebellum. Pet'r's Ex. 56 at 1. Dr. Huq argued that α3-AChR could also bind to other AChR subunit receptors in the brain, and that "the antibody specificity in different patients and different subgroups . . . [may explain] why neuropsychiatric symptoms rather than profound dysautonomia were more prevalent in the low to medium titer group." *Id.* at 5. He acknowledged Dr. Lancaster's argument and literature regarding the false positives associated with the α3-AChR ABV test but opined that "it appears . . . that McKeon et al. interpret their own data differently," citing to the reported 46% positive predictive value for an autoimmune neurological diagnosis in the low titer group. *Id.* (citing Pet'r's Ex. 40).

Dr. Huq used the majority of his second supplemental report to discuss Petitioner's alternative diagnosis of conversion disorder, questioning why her treaters would prescribe her "potentially toxic immunotherapy if they "were certain, or even suspicious, about the diagnosis of conversion disorder." Pet'r's Ex. 72 at 1. He also pointed to Petitioner's psychiatric evaluation and lack of a DSM V diagnosis as evidence against the diagnosis of conversion disorder. *Id.* Dr. Huq also returned to his prior argument that conversion disorder was a brain disorder, noting that dystonia, once thought to represent a conversion disorder, now has "a well understood brain mechanism." *Id.* (citing Pet'r's Ex. 86).[42] He then presented a new argument that if Petitioner did indeed have conversion disorder, it would have been caused by her Tdap vaccine. *Id.* at 2. He cited to Ercoli et al.[43] as support, which was a case report identifying functional neurological disorder ("FND") following COVID-19 vaccination. *Id.* (citing Pet'r's Ex. 76). Dr. Huq argued that although the underlying pathogenesis of conversion disorder was unknown, it had been linked to

---

[41] Paul Whiteaker et al., *Involvement of the α3 Subunit in Central Nicotinic Binding Populations*, 22 J. NEUROSCIENCE 2522 (2002).

[42] Rachel Newby et al., *A History of Dystonia: Ancient to Modern*, 4 MOVEMENT DISORDERS CLINICAL PRACTICE 478 (2017).

[43] Tommaso Ercoli et al., *Functional Neurological Disorder After COVID-19 Vaccination*, 42 NEUROLOGICAL SCIENCES 3989 (2021).

low-grade inflammation and elevated CRP levels. *Id.* (citing Pet'r's Ex. 77;[44] Pet'r's Ex. 81).[45] "Thus, inflammation induced by TdaP vaccination could have predisposed [Petitioner] to develop conversion disorder." *Id.*

In describing how the Tdap vaccine could cause this kind of inflammatory response, Dr. Huq explained that inflammation is "essential" after vaccination for the adaptive immune system to work properly, but a vaccine may "also produce local and systemic inflammation that may vary depending on individual susceptibility." Pet'r's Ex. 72 at 2. He also argued that there was evidence that cytokines were produced both at the local injection site and in "distant organs" following vaccination. *Id.* (citing Pet'r's Ex. 87).[46] Regarding how this could affect brain function, Dr. Huq stated the following:

> Peripheral inflammation can affect brain function. Peripherally induced inflammation can access brain (sic) and influence neuronal and glial physiology. Inflammation can disrupt blood brain barrier (sic), cytokines can access the brain through leaky regions of brain (sic) such as circumventricular regions. Cytokines can bind to cytokine specific transport molecules expressed on brain endothelium. Even low levels of circulating cytokines have been postulated to affect brain function. . . . Inflammation induced by vaccination may be transmitted to the brain and produce or aggravate a proinflammatory state and trigger sickness behavior or even conversion disorder in a susceptible individual. . . . Thus, even if we think that [Petitioner] had conversion disorder, TdaP vaccination induced inflammation could have been a significant contributory factor.

*Id.* at 2–3.

Turning to diagnosis, in addition to his previously discussed arguments, Dr. Huq asserted that Petitioner's "laboratory evidence of systemic inflammation (elevated CRP and ESR)" was evidence she suffered from autoimmune encephalopathy. Pet'r's Ex. 72 at 3. Elevated CSF "may be seen in autoimmune encephalitis but are not uniformly present." *Id.* (citing Pet'r's Ex. 74;[47] Pet'r's Ex. 78).[48] He also noted that "over half of patients with autoimmune encephalitis" will have normal brain and spinal MRIs. *Id.* at 4. (citing Pet'r's Ex. 65; Pet'r's Ex. 74; Pet'r's Ex. 78). Accordingly, he opined the lack of these findings in Petitioner's case did not preclude a diagnosis of "autoimmune encephalitis." *Id.* Addressing his theory of molecular mimicry, Dr. Huq reiterated that "[i]t is not clear if molecular mimicry is the mechanism of autoantibody production against [α3-AChR], and again mentioned six other potential causative mechanisms. *Id.* at 5.

---

[44] Christina van der Feltz-Cornelis et al., *Assessment of Cytokines, MicroRNA and Patient Related Outcome Measures in Conversion Disorder/Functional Neurological Disorder (CD/FND): The CANDO Clinical Feasibility Study*, 13 BRAIN, BEHAVIOR, & IMMUNITY – HEALTH 100228 (2021).

[45] Kasia Kozlowksa et al., *Blood CRP Levels Are Elevated in Children and Adolescents With Functional Neurological Symptom Disorder*, 28 EUR. CHILD & ADOLESCENT PSYCHIATRY 491 (2019).

[46] Weihong Pan et al., *Cytokine Signaling Modulates Blood-Brain Barrier Function*, 17 CURRENT PHARMACEUTICAL DESIGN 3729 (2011).

[47] Tania Cellucci et al., *Clinical Approach to the Diagnosis of Autoimmune Encephalitis in the Pediatric Patient*, 7 NEUROLOGY NEUROIMMUNOLOGY NEUROINFLAMMATION 663 (2020).

[48] Yael Hacohen et al., *Paediatric Autoimmune Encephalopathies: Clinical Features, Laboratory Investigations and Outcomes in Patients With or Without Antibodies to Known Central Nervous System Autoantigens*, 0 J. NEUROLOGY NEUROSURGERY PSYCHIATRY 1 (2012).

### 4. Dr. Lancaster's Supplemental Reports

Dr. Lancaster began his first supplemental report by critiquing Dr. Huq's use of the Graus et al. criteria to support the contention that Petitioner suffered from autoimmune encephalitis. Resp't's Ex. C at 1. "As an author on this paper . . . [i]t was definitely not the intent . . . to imply that meeting these criteria made the diagnosis certain but rather merely possible." *Id.* Dr. Lancaster stressed the importance of the third criterion regarding alternative causation, as this "would not prevent the diagnosis of autoimmune encephalitis from being rejected if there were an alternative cause found later." *Id.* He also critiqued Dr. Huq for "overlooking the lack of clear new focal neurologic findings" in Petitioner's case. *Id.* This would include "objective evidence of focal organic injury to the [CNS]," which Dr. Lancaster argued was not present. *Id.* Dr. Lancaster also argued that conversion disorder was a more likely diagnosis than autoimmune encephalitis, therefore not satisfying the third criterion. *Id.* In cases with a potential autoimmune encephalitis diagnosis, Dr. Lancaster explained he would want to see clinical symptoms of encephalitis and "some kind of supporting objective evidence," to include clinical signs, MRI findings, or positive CSF inflammation. *Id.* He also disagreed that Petitioner suffered from dysautonomia, as "[e]pisodes of passing out in a patient with documented non-epileptic events would not be reliable evidence of autonomic failure." *Id.* at 2.

Dr. Lancaster next reiterated his belief that Petitioner suffered from conversion disorder and discarded Dr. Huq's theory that conversion disorder could be mechanically caused by a vaccine. Resp't's Ex. C at 2. He also argued that "Dr. Huq's alternative proposal that [Petitioner] had some unspecified subcortical disorder as an explanation for the normal EEG studies during her events is highly unlikely to be correct and not supported by the overall medical literature." *Id.* He noted that Dr. Huq had failed to identify a disease process or consistent diagnosis and had not "provided any literature explaining what this disease is and why it is the correct diagnosis." *Id.*

Turning to the issue of α3-AChR antibodies, Dr. Lancaster stated that Dr. Huq had failed to provide evidence that the Tdap vaccine could cause these antibodies, and discounted the medical literature relied on by Dr. Huq as irrelevant to the present case. Resp't's Ex. C at 2. ADEM, APS, and anti-NMDAR encephalitis are not analogous conditions to Petitioner's alleged α3-AChR autoimmune encephalitis, and Dr. Lancaster noted that Dr. Huq had not "specified any particular mechanism or provided any basis to conclude that such a mechanism is likely to be applicable or have occurred here." *Id.*

Dr. Lancaster next addressed the McKeon et al. paper and Dr. Huq's characterization of Petitioner's injury, stating that although "a small fraction of patients with [] median titer antibodies had the symptom of encephalopathy[, e]ncephalopathy is not encephalitis." Resp't's Ex. C at 3. "Encephalopathy is [] a general term for any disease in which the function of the brain is affected by a substance or condition," and has "thousands of causes." *Id.* "Very few cases of encephalopathy have anything to do with encephalitis, which is a specific term for brain inflammation." *Id.* He also explained that the singular patient from the McKeon et al. study with encephalitis had co-existing ANNA1 antibodies, which are associated with encephalitis, and thus the α3-AChR positive result "was probably incidental." *Id.* Dr. Lancaster did acknowledge the authors speculation that "some patients could have autoantibodies to other types of AChR receptors including those in the brain," but argued they failed to provide follow-up research to this

point. *Id.* He also conceded the presence of α3-AChR in the brain, but noted it was "much lower than in autonomic structures." *Id.*

In Dr. Lancaster's second supplemental report, he contested Dr. Huq's theory that vaccines could cause conversion disorder through a biomechanical mechanism. Resp't's Ex. D at 2. He explained that conversion disorder was a "subconscious reaction to stress" and that "[t]he idea that conversion disorder is actually a previously unrecognized inflammatory brain disease is not supported by the medical literature and well outside the mainstream medical thinking on the condition." *Id.* at 2–3. He continued by noting that the very name of the condition came from the "'conversion' of underlying emotional distress into physical (neurologic) findings." *Id.* at 3. (citing Resp't's Ex. D, Tab 1).[49] He critiqued the studies relied on by Dr. Huq, calling the inflammatory abnormalities "minor" and CRP "a non-specific marker of inflammation that could be elevated under many conditions." *Id.* He also found it notable that none of these patients had autoimmune encephalitis. *Id.* He argued that the mechanism of conversion disorder induced via inflammatory cytokines from the Tdap vaccine would not explain the months-long course of conversion disorder given the brief and self-limited cytokine response to a vaccine. *Id.*

### 5. Dr. Huq's Testimony

At the entitlement hearing Dr. Huq characterized Petitioner's presentation as a "POTS-like condition" and speculated whether Petitioner's fainting spells were "brain fog," a symptom associated with POTS.[50] Tr. 29. He explained that he did not believe Petitioner had conversion disorder because of Dr. Nespeca's recorded doubt regarding the diagnosis and Petitioner's presentation. Tr. 39. He explained that a patient needed to show two criteria to meet a conversion diagnosis: inconsistency, where "each time you present you see a different kind of symptom" or an internal inconsistency, such as a seizure recorded on EEG without a seizure pattern; and incongruence, which is when the patient's symptoms do not line up with a known neurological or psychiatric condition. Tr. 39–42. Dr. Huq opined that Petitioner showed no incongruence because "her symptoms are consistent with [] what . . . might happen from a postural autonomic failure, like condition like POTS." Tr. 42. He noted a lack of bullying, abuse, or traumatic life event that may have precipitated her conversion disorder, though he acknowledged that such disorders may come from avoidance, such as "want[ing] to avoid going to school." Tr. 43.

On cross examination, Dr. Huq was asked whether Petitioner's normal Holter monitoring and EEG would be examples of inconsistency, and he explained that the level of inconsistency allowed before a conversion diagnosis "varies person to person [and] varies with the doctor." Tr. 206. He also pointed to the overall lack of understanding of Petitioner's diagnosis from her treating physicians, stating that "nobody really understood very well. Everybody is saying that variety of symptoms, difficult to explain, and that means that people . . . didn't have a conviction in any diagnosis." Tr. 207. He did explain that Petitioner's presentation was consistent with POTS, but that Petitioner's cardiologist "didn't evaluate for dysautonomia the way it needs to be done." Tr. 208, 212. He recognized that seven of Petitioner's treating physicians across a variety of specialties

---

[49] Anthony Feinstein, *Conversion Disorder: Advances in Our Understanding*, 185 CANADIAN MED. ASS'N J. 915 (2011).

[50] Dr. Huq acknowledged that none of Petitioner's treating physicians considered POTS as a potential diagnosis. *See* Tr. 29–30.

considered a diagnosis of conversion disorder, but maintained that the opinions of Dr. Sheets and Dr. Nespeca regarding autoimmune encephalopathy were correct. Tr. 235.

Dr. Huq acknowledged Petitioner did not meet all the criteria for POTS, and thus he characterized her presentation as POTS-like. Tr. 45. "[S]he has sort of symptoms of postural autonomic failure, and this is coming from a relatively new autoantibody, . . . and so it is a type of autoimmune encephalitis where you don't have seizure, where you don't have . . . a severe depression of your awareness or altered mental consciousness." Tr. 46. He also explained that because the AChR receptors make up less than 1% of the brain, he would not expect to see abnormal CSF or MRI findings because the "autoimmunity is targeted towards a very [small] group of cells, but those cells are important." Tr. 47. He also recognized that Dr. Nespeca performed the active stand test for POTS, which was normal, but opined that a normal finding on this test would not exclude a diagnosis of POTS in the same way a tilt-table test would. Tr. 47–48. He later testified that Vernino & Lennon supported the association of low-titer α3-AChR and partial autonomic dysfunction. Tr. 63 (citing Resp't's Ex. A, Tab 1).

Dr. Huq testified that he believed Petitioner's May 18, 2019 dermatology visit was significant due to her report of facial flushing and cold hands and feet, and opined these symptoms were supportive of partial autonomic failure. Tr. 74. He opined that the episodic nature of Petitioner's symptoms was also supportive of postural autonomic failure "because the symptoms are kicking in when you are trying to do something or trying to stand [] which are basically the definition of orthostatic intolerance." Tr. 77. He also found it significant that Petitioner was prescribed a beta-blocker, as this is typically prescribed for POTS. Tr. 83.

Turning to McKeon et al., Dr. Huq testified that autonomic nerve failure was a form of peripheral neuropathy, and thus Petitioner's symptoms would align with the findings of the authors for medium and low titer groups. Tr. 83. He also stated it was possible that more common AChR antibodies found in the brain, such as α4 and α7, may be binding to the α3-AChR receptor because the test is a "radioimmunoassay that just measure the binding of the antibody . . . so we really don't know which antibody – which molecule the body started." Tr. 89. He speculated that the binding of these other antibodies to the α3-AChR could cause a POTS-like phenotype, but "we don't know." Tr. 90–91. Dr. Huq also argued that Vernino & Lennon[51] supported a POTS-like presentation was consistent with the symptoms associated with elevated α3-AChR. Tr. 86. He also disagreed with Dr. Lancaster's argument that Petitioner's results could have been false positives. Tr. 93.

Dr. Huq also opined that a peripheral neuropathy could not be ruled out in Petitioner's case because an EMG, nerve conduction study, and skin biopsy had not been performed. Tr. 94. On cross examination he testified that Petitioner may have had a small-fiber neuropathy because it "can present like POTS." Tr. 168. When asked whether Petitioner could have had α3-AChR antibodies prior to the onset of symptoms, Dr. Huq noted there was no other reasonable explanation of her symptoms and thus concluded the antibodies must be pathogenic. Tr. 94–95. However, he did acknowledge that he could not "100 percent rule [] out the possibility that maybe she had this antibody" prior to vaccination. Tr. 95. Even if Petitioner had the antibody prior to vaccination, Dr. Huq still opined the vaccine caused her symptoms through inflammation which caused "blood-

---

[51] The transcript occasionally refers to Vernino et al. as "Bernina," however, Petitioner cites to both references as Respondent's Ex. A, Tab 1, which is the filed Vernino et al. article. *See* Tr. 96.

brain barrier disruption," allowing the antibody to enter the brain. *Id.* He clarified his ultimate diagnosis of Petitioner to be "autoimmune encephalopathy due to autoantibody, [α3-AChR], and her condition mostly presented as a POTS-like postural autonomic failure or dysregulation." *Id.* He then referred to Petitioner's diagnosis as "autoimmune encephalitis with a POTS-like phenotype." Tr. 96.

Turning to the Graus et al. criteria, Dr. Huq testified why he believed Petitioner met each of the three criteria for an autoimmune encephalitis diagnosis. Tr. 106. For the first criterion, he noted Petitioner's subacute onset within three months, and for the second, he pointed to Petitioner's headaches, tremors, and "unusual movements" as evidence of focal neurologic findings. *Id.* Dr. Huq could only think of Petitioner's prior "viral infection-type symptoms" as a reasonable alternative cause of her symptoms, but he opined this was "the prodromal symptoms of autoimmune encephalopathy" because one day was not enough time for a viral infection to cause her symptoms. Tr. 107.

Dr. Huq also testified that although conversion disorder is a DSM V diagnosis, he believed it to be a neurologic disorder because "all psychiatric conditions come from the brain" and diagnosis of conversion disorder often requires a neurologist. Tr. 118. "In order to make the diagnosis, you have to do an EEG and show that the event you are evaluating is not a seizure." *Id.* However, for more complicated phenotypes, such as Petitioner's, Dr. Huq acknowledged a psychiatrist would be needed to rule out conversion disorder, which he argued was the case here. Tr. 119. He also argued that even if Petitioner did have conversion disorder, it came from "the psychoanalytic theory of inner conflict, stress [] getting converted into physical symptoms . . . there is no evidence for that." Tr. 120. Instead, Dr. Huq stated that "cytokines and inflammation [have] at least some relation, because conversion disorder has some similarity to that sickness behavior." *Id.* He discussed Boeckle et al. and the contention that infection had a relation to conversion disorder, explaining "infection produces sickness behavior, which is [an] evolutionarily adaptive response for our survival, and so the thinking is that those part of the brain [responsible for conversion disorder] . . . that would be affected by the cytokine or inflammation, and peripheral inflammation can be just limited to the brain." Tr. 123. Dr. Huq also compared these findings to the symptoms of long COVID after both COVID vaccination and infection, which he stated "has a lot of similarity to POTS-like symptoms." Tr. 124. However, on cross examination Dr. Huq admitted that his theory of causation would be weaker if Petitioner did in fact have conversion disorder and that he was not familiar enough with conversion disorder to say with preponderant confidence that there was a biological mechanism connecting cytokine regulation to conversion disorder. Tr. 240.

Next, Dr. Huq discussed Herve et al.[52] and the reactogenicity of vaccines, which he described as "fever, headache, lethargy, [and] malaise," caused in this case by local inflammation from the vaccine site. Tr. 128. He explained that cytokines and other chemicals released from this inflammation go to the brain, where "some areas [do not] have the blood-brain barrier, so it can directly reach it there." *Id.* "There are several cell adhesion molecules that can bind activated immune cells . . . so you end up creating a [] mirror type of inflammation in the brain." Tr. 129. He opined that this mechanism, combined with the articles he provided regarding anti-NDMA receptor encephalitis and ADEM following Tdap vaccination, was sufficient to conclude that Petitioner's Tdap vaccine could have caused her to develop autoimmune encephalitis. Tr. 135–39.

---

[52] Caroline Herve et al., *The How's and What's of Vaccine Reactogenicity*, 4 NPJ VACCINES 39 (2019).

Evidence of ADEM following the Tdap vaccine supports Dr. Huq's mechanical theory of causation because ADEM following Tdap vaccination is caused by "molecular mimicry or cytokine." Tr. 145. In Petitioner's case, the "targets are different, and the why it is different, it's probably most individual susceptibility." *Id.* Dr. Huq continued, opining that the Tdap vaccine "can produce [] alpha-3 autoimmunity . . . by molecular mimicry to other antigen [and] can also lead to the production of [] unlinked or unassociated molecules, and so it give[s] me more confidence that . . . autoimmune encephalitis tied to the link to the alpha-3 molecule can happen after Tdap." Tr. 145–46. He also argued that the genetic makeup of an individual determined the ultimate mechanism of the cause of encephalitis, to include polyclonal activation and cytokine activation, and opined they may also have been the cause of Petitioner's symptoms. Tr. 157.

When asked to explain the logical sequence of cause and effect connecting his theory to Petitioner's injury, Dr. Huq provided the following testimony:

> So she received the vaccines, then [a] few weeks later, she initially had [] prodromal symptoms, . . . [a]nd then she had a set of symptoms that I feel represent partial autonomic failure, which is internally very consistent with the alpha-3 antibody production, and how she made this antibody . . . that inflammation from the local site can just mutate to a distant place, like a brain, and it can disrupt that brain barrier and create inflammation in the brain, and that can allow . . . this antibody is produced in the periphery. We don't know whether alpha-3 antibody was produced in the spleen, in the bone marrow, [] or it was inside the brain, which then came out because of blood-brain barrier disruption. . . . [T]here are a variety of ways this antibody can be produced. It could be by . . . molecular mimicry of tetanus toxoid with MOG protein, with beta-2 glycoprotein. So it can produce some autoimmunity and some low-level inflammation in the brain and then allow the immune cell to see that molecule, . . . and that way one can produce cytokines, and in our body, we have auto-reactive T-lymphocytes that are probably in more frequency than autoimmune disease patient. We just have them suppress variability of T cells, and that can be activated by cytokine inflammation. That can be another way that alpha-3 molecules are produced.

Tr. 160–61. He also opined that if Petitioner's febrile illness was the result of an infection and not prodromal symptoms of an autoimmune condition, then "both are substantially and probably important in a perfect storm situation . . . and because I'm thinking this is the perfect storm situation, if you miss one of those, it would not have happened." Tr. 163. When asked if there was any difference between postinfectious and post-vaccine autoimmune encephalitis, Dr. Huq testified, "I don't think there is any difference." Tr. 139. Dr. Huq compared the timing of Petitioner's symptoms to the timing reported to be associated with the development of ADEM and other forms of autoimmune encephalitis, and concluded that the three-week onset following Tdap vaccination was appropriate. Tr. 164. On cross examination, Dr. Huq clarified that there was no direct relation between molecular mimicry of anti-beta-2 glycoprotein 1 antibodies from tetanus toxoid and the development of α3-AChR antibodies, and that his suggestion to this point was theoretical based upon the development of other forms of encephalitis following Tdap vaccination. Tr. 237, 242–43.

31

Also on cross examination, Dr. Huq testified that he believed Petitioner had autoimmune encephalopathy[53] and did not have POTS, but had a POTS-like phenotype. Tr. 168. When asked to then clarify his biomechanical theory (that relied on inflammation), he explained that Petitioner's inflammation could have been on a molecular level, which would not have been seen by an MRI. Tr. 181. Dr. Huq admitted there was no objective evidence of inflammation from Petitioner's clinical course but stated that "[t]he evidence of inflammation is through the mechanistic aspect [of] it . . . how a vaccination can produce inflammation, it can go to the brain. So it is coming from my [] theoretical understanding, not from the patient's clinical info." Tr. 184, 187. He also agreed that his theory was "based upon indirect evidence using other vaccines and other autoimmune diseases." Tr. 239.

On redirect examination, Dr. Huq was asked to clarify his mechanism for causation, and he provided the following explanation:

> [S]omehow this Tdap vaccination produced the antibody, the alpha-3 nicotinic receptor antibody, the production of this antibody. So [my] theory mostly talks about [] how that could be possible, and so the [] autoantibody could be produced via molecular mimicry. It can be produced via, for example, activation of the autoreactive T cells that we have all in our system. It can be via polyclonal B cell activation, for example, and there are several other mechanisms, or another common way would be if there is exposure of immune cells to this molecule. And the way I think some of these things might have happened, that we have some example of molecular mimicry, like Tdap, tetanus toxoid as similar or proven molecular mimicry, beta-2 glycoprotein, which is also a model of – which is the antibody that cause a condition called antiphospholipid syndrome. And in antiphospholipid syndrome, which [] we have submitted two articles . . . those articles shows that you can have antiphospholipid syndrome, you can have a variety of neurological symptoms, and it is not clear, was it all happening from the blood clot? And so those others there, they wondered whether the presence of beta-2 glycoprotein in the brain can also produce some symptoms. . . . [S]o that's not, of course, the alpha-3 antibody, but if . . . this molecular mimicry could potentially allow the immune cells to see other molecules in the brain, which include different alpha subunit.

Tr. 391–92. He also used MOG proteins as an example of molecular mimicry, which would allow "immune cells to enter the brain tissue and then see the alpha-3 antibody and produce antibody against the alpha-3." Tr. 394. Noting however, that he was not implicating MOG or beta-2 glycoproteins in this case, but rather he was "saying that how they can potentially lead to the production of alpha-3 and nicotinic receptor antibody." Tr. 395–96.

### 6. Dr. Lancaster's Testimony

---

[53] Dr. Huq frequently used the terms autoimmune encephalopathy and autoimmune encephalitis interchangeably throughout his reports and testimony. On cross examination he clarified that he was intending to refer to autoimmune encephalopathy, and much time was spent clarifying this issue. Tr. 169–215.

Dr. Lancaster began his testimony with a brief explanation of the difference between encephalopathy and encephalitis, stating that "encephalopathy is a term for a failure of brain function or a failure of cognition," while encephalitis "implies that there was some brain inflammation." Tr. 282. He then turned to his disagreement with Dr. Huq's characterization of Petitioner's symptoms as POTS, explaining "POTS involves primarily dysautonomia . . . [t]his is not generally thought to be due to encephalitis or involve primarily the brain." Tr. 285. He continued that the antibodies involved in this case are "primarily occurring at autonomic ganglia, outside the central nervous system and not part of the brain." *Id.* He then contextualized Graus et al., noting that in addition to the criteria, "we would also want something to think it's not simply a psychiatric disorder, an intoxication, or some other cause of brain failure." Tr. 288. This would include "focal, new central nervous system findings," such as paralysis, MRI or CSF abnormalities, or seizures. Tr. 288–89. It was the lack of these findings in Petitioner, in addition to the potential for conversion disorder, that led Dr. Lancaster to believe Petitioner did not have autoimmune encephalitis. Tr. 289–90. Dr. Lancaster also noted three years in which Petitioner's symptoms would worsen around the beginning of the school year, improve when Petitioner was pulled out of school, and then relapse shortly or soon before returning to school. Tr. 331–36.

Dr. Lancaster later explained that it was unlikely Petitioner's symptoms, including her fainting, was a result of autonomic failure. Tr. 314. The only way this could occur would be through a decline in blood pressure, and he "would expect some abnormalities to be detected on a cardiovascular examination and . . . on the Holter monitor." *Id.* He also disagreed that dysautonomia would not be detectable on an EEG, because passing out would alter a person's brain waves and be detectable. Tr. 316. In particular, Dr. Lancaster disagreed with Dr. Huq's argument that Petitioner did not have a sufficient autonomic workup. *Id.* Instead, he asserted that her treating physicians did not have significant concern for POTS given her cardiac, neurologic, and autonomic testing results, and that if such a concern existed it would have been noted. Tr. 317.

Dr. Lancaster also explained why he believed Petitioner suffered from conversion disorder despite a lack of a formal diagnosis of depression or anxiety. Tr. 330. "It's quite common for people with conversion disorder to not necessarily have severe depression or anxiety. . . . Many of them just have the conversion process and not those other disorders." *Id.* He continued that "[c]onversion disorder is primarily a psychiatric disorder where people are having, we believe, an aberrant response to stress and other factors." Tr. 343. He noted that while a prior history of abuse was a major risk factor, "many patients have no clear history of abuse or trauma, and yet they still have this process." Tr. 331. In Petitioner's case, Dr. Lancaster referred to the correlation of the start of her symptoms and the return to school and opined that this could have been a trigger, because school can be a stressor for children. Tr. 332.

Turning to the issue of α3-AChR antibodies, Dr. Lancaster explained that Vernino et al. showed "very clearly and elegantly that if you have an autoimmune disease with a true, bona fide immune response to this receptor, that it can disrupt these signals," resulting in severe autonomic failure. Tr. 298. "This is not in any way an encephalitis or an encephalopathy. It is an autoimmune disease of a part of the peripheral nervous system, particularly the autonomic part of the peripheral nervous system." Tr. 299. He stated that he would not use the α3-AChR antibody test to diagnose encephalitis or encephalopathy in patients and that he would ultimately prefer if this test was not included in an autoimmune encephalopathy panel. Tr. 303. In the 20 patients Dr. Lancaster had seen personally with positive tests for α3-AChR, he testified that only one suffered from

dysautonomia with a level of 13.0 nmol/L and none had any autoimmune disorder. Tr. 304. He also opined that it was "doubtful it can cause even peripheral neuropathy, because there are no ganglia on peripheral sensory motor nerves." Tr. 308.

Addressing Dr. Huq's theory of molecular mimicry, Dr. Lancaster stated that "[h]e did not provide any evidence that such mimicry actually occurs or any plausible reason to believe it would occur." Tr. 338. He also argued that Dr. Huq had not specified a component of the Tdap vaccine that could cause the molecular mimicry, what the mimicked substance in the human body was, or "why there would be any structural resemblance between anything in the vaccine that could cause immune cross-reactivity to any substance in the human body." Tr. 338–39. He testified that Dr. Huq's cytokine theory did not make sense because "just the fact that cytokines are activated by many processes doesn't mean that those processes cause each other to happen. Otherwise, a vaccination would cause everything that activates or associates with the activation of cytokines." Tr. 340–41. He also contested Dr. Huq's theory that the Tdap vaccine could cause conversion disorder stating, "[t]he idea that a vaccination would somehow change the brain in such a precise way as to reset our thoughts and our perceptions of our own illness is implausible and not reasonable." Tr. 343. He ultimately opined that while he did not believe Petitioner suffered from autoimmune encephalitis, if she did, her febrile illness in early September 2017 was a more likely cause than the vaccine. Tr. 346. On cross examination Dr. Lancaster was asked what evidence he believed was required to show an association between the Tdap vaccine and "the type of autoimmune encephalopathy alleged in this case," and he provided three criteria: "a very clear idea we're dealing with an autoimmune disease, some idea of how it's triggered, and some reasonable basis to believe that the vaccination can trigger that immune response to occur." Tr. 359–60.

## V.    Applicable Legal Standards

To receive compensation under the Vaccine Act, a petitioner must demonstrate either that: (1) the petitioner suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as modified by 42 C.F.R. § 100.3; or (2) that the petitioner suffered an "off-Table injury," one not listed on the Table, as a result of her receiving a covered vaccine. *See* § 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006). In this case, Petitioner does not allege a Table injury, and thus Petitioner must prove by preponderant evidence that her injury was caused-in-fact by a Table vaccine.

### A.    Factual Issues

A petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records, "in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejection the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 538 (2001)

34

("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance").

There are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting *Murphy v. Sec'y of the Dep't of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (Fed. Cl. 1991)). Ultimately, a determination regarding a witness' credibility is needed when determining the weight that such testimony should be afforded. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Dep't of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Valenzuela v. Sec'y of Health & Hum. Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng. v. Sec'y of Health & Hum. Servs.*, No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by them.").

## B. Causation-In-Fact

To establish causation-in-fact, a petitioner must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. § 300aa-13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321–22 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999).

In the seminal case of *Althen v. Sec'y of Health & Hum. Servs.*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. *See* 418 F.3d 1274, 1278–79 (Fed. Cir. 2005). The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *Id.* "[C]lose calls regarding causation are resolved in favor of injured claimants." *Id.* at 1280. Further, evidence used to satisfy one prong of the test may overlap to satisfy another prong. *Capizzano*, 440 F.3d at 1326.

Under the first prong of *Althen*, a petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *See Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. den'd*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d

1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548–49. Petitioners are not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge[] the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano*, 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278–81; *see also Moberly*, 592 F.3d at 1322. However, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Indeed, the Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019) (citing *Moberly*, 592 F.3d at 1322; *LaLonde*, 746 F.3d at 1339). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322. In general, "the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." *LaLonde*, 746 F.3d at 1339.

Furthermore, establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of her claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). The Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* requires that courts determine the reliability of an expert opinion before it may be considered as evidence. 509 U.S. 579 (1993). However, in the Vaccine Program, the *Daubert* factors are used in the weighing of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("[U]niquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to the persuasiveness of expert testimony already admitted."); *see also Cedillo v. Sec'y of health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). Under *Daubert*, the

> Factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

The *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The factors do not "constitute a 'definitive checklist or test'" and may be applied differently depending on the facts of a particular case. *Id.* at 150 (quoting *Daubert*, 509 U.S. at 593).

"In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establish a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590 (citation omitted). Thus, for Vaccine Act claims, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Synder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also D'Tiole v. Sec'y of Health & Hum. Servs.*, No. 15-085V, 2016 WL 7664475, at *24 (Fed. Cl. Spec. Mstr. Nov. 28, 2016) (stating that the Vaccine Act "require[s] a chain of reliable propositions supporting [a] petitioner's theory").

Under the second prong of *Althen*, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418 F.3d at 1279. The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the vaccination." 2004 WL 1717359, at *4 (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (citation omitted). Nevertheless, "[r]equiring epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibly raises a claimant's burden under the Vaccine Act and hinders the system created by Congress . . . ." *Capizzano*, 440 F.3d at 1325–26. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen* 418 F.3d at 1280.

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). Indeed, when reviewing the record, a special master must consider the opinions of treating physicians. *Capizzano*, 440 F.3d at 1326. This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras*, 993 F.2d at 1528. However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby*, 997 F.3d at 1383 (finding that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition). While a special master must consider these opinions and records, they are not "binding on the special master or court." § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical

records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting with testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *LaLonde v. Sec'y of health & Hum. Servs.*, 110 Fed. Cl. 184, 203 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to finger causation-in-fact." *de Bazan v. Sec'y of health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

Although a temporal association alone is insufficient to establish causation, under the third prong of *Althen*, a petitioner must show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d at 1278. The special master cannot infer causation from temporal proximity alone. *See Thibaudeau v. Sec'y of health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Grant*, 956 F.2d at 1148 ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period . . . [w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983))).

A petitioner who satisfies all three prongs of the *Althen* test has established a prima facie showing of causation. *Hammitt v. Sec'y of health & Hum. Servs.*, 98 Fed. Cl. 719, 726 (2011). A petitioner who demonstrates by a preponderance of the evidence that she suffered an injury caused by vaccination is entitled to compensation unless the respondent can demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to the vaccination. *See Althen*, 418 F.3d at 1278; *Knudsen*, 35 F.3d at 547. In such a case, the government must not merely prove the existence of an alternative cause, but that such an alternative actually caused the injury. *Kundsen*, 35 F.3d at 549. Consequently, when and if the petitioner establishes a prima facie case, the burden the shifts to the government to prove that an alternative cause, unrelated to the administration of the vaccine, was the "sole substantial factor" in causing the alleged injury. *See de Bazan*, 539 F.3d at 1354; *see also Hammitt*, 98 Fed. Cl. at 726 (explaining that respondent's burden is to show that the "factor unrelated" was the "sole substantial factor" in causing the injury). Additionally, a factor unrelated "may not include 'any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition.'" § 300aa-13(a)(2); *see also Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349 (Fed. Cir. 2010) (stating that an idiopathic diagnosis cannot be a "factor unrelated," as it is idiopathic).

## VI.    Analysis

### A.  Diagnosis

In cases where the diagnosis is contested, "special masters may find whether a preponderance of evidence supports any proposed diagnosis before evaluating whether a vaccine caused that illness." *Hibbard v. Sec'y of Health & Hum. Servs.*, No. 07-446V, 2011 WL 1766033, at *6 (Fed. Cl. Spec. Mstr. Apr. 12, 2011) (citing *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1345–46 (Fed. Cir. 2010)). In this case, diagnosis is in dispute, so it is appropriate to address it first.

Throughout the litigation of her claim, Petitioner and her expert have referred to her condition in a variety of ways: in Petitioner's amended petition and pre-hearing brief, she claims an injury of autoimmune encephalomyelitis; throughout Dr. Huq's reports and testimony, he refers to Petitioner's injury as an autoimmune encephalopathy, an autoimmune encephalitis, an "alpha-3 nicotinic receptor antibody disease with partial autonomic failure," a "POTS-like postural autonomic failure or dysregulation," a peripheral neuropathy, and a small-fiber neuropathy.[54] *See* Am. Pet. at 1; Pet'r's Br. at 1; Tr. 94–95, 387; *see generally* Pet'r's Ex. 14; Pet'r's Ex. 72. Conversely, Respondent contends that Petitioner suffers from conversion disorder, as speculated by several of her treating physicians.

First, it is important to note that the terms Petitioner uses to refer to her injury throughout her claim are distinct diagnoses. According to Dorland's Medical Dictionary, encephalopathy is "any degenerative disease of the brain." *Encephalopathy*, DORLAND'S. Encephalitis is a different, though related, condition defined as "inflammation of the brain." *Encephalitis*, DORLAND'S. Further distinct from these, encephalomyelitis is defined as "inflammation involving both the brain and the spinal cord." *Encephalomyelitis*, DORLAND'S. Though these three conditions all involve the brain, each is more specific than the last. These distinctions provide an important framework for analyzing Petitioner's arguments regarding diagnosis in this case.

Next, a point of clarification. The fact Dr. Huq used the terms encephalopathy and encephalitis interchangeably was a significant point of confusion during the entitlement hearing. *See* Tr. 169–215. Dr. Huq ultimately testified that he believed Petitioner had "alpha-3 nicotinic receptor antibody disease with partial autonomic failure," which he stated was an encephalopathy and not an encephalitis. *See* Tr. 95. However, a substantial amount of the medical literature he relied on throughout his reports referred to various forms of encephalitis, including the Graus et al. criteria Dr. Huq used to diagnose Petitioner. *See* Tr. 95; *see also* Pet'r's Ex. 36 (discussing anti-NDMA receptor encephalitis following Tdap vaccination); Pet'r's Ex. 54 (discussing Anti-NMDA receptor encephalitis); Pet'r's Ex. 55 (discussing encephalomyelitis following HPV vaccination); Pet'r's Ex. 62 (discussing antibody-mediated encephalitis); Pet'r's Ex. 65 (providing diagnostic criteria for autoimmune encephalitis); Pet'r's Ex. 74 (discussing the diagnosis of autoimmune encephalitis). He also frequently argued about the presence of undetectable inflammation in Petitioner's brain despite claiming that Petitioner's injury was not an encephalitis. *See* Tr. 160. And notably, despite the abundant variation in how Dr. Huq characterized Petitioner's injury, he never referred to or discussed Petitioner's injury as encephalomyelitis, which is the injury claimed in Petitioner's actual petition.

---

[54] Because Petitioner never claims a peripheral nerve injury and because Dr. Huq does not spend a significant amount of time discussing whether Petitioner suffered from a peripheral nerve injury, I will not discuss whether Petitioner suffered from a small-fiber neuropathy or other peripheral neuropathy.

Petitioner's treating physicians also varied in their diagnosis of Petitioner. At the outset of her presentation, the majority of her physicians suspected conversion disorder or a psychosomatic process as being responsible for her symptoms. *See* Pet'r's Ex. 3 at 173 (neurologist Dr. Jindal suspecting conversion disorder), 406 (cardiologist Dr. Williams suspecting conversion disorder), 475 (rehabilitation specialist Dr. Biffl suspecting conversion disorder), 940 (infectious disease specialist Dr. Sawyer suspecting conversion disorder); Pet'r's Ex. 4 at 35 (PCP Dr. Madany recommending Petitioner seek a psychiatric consultation); Pet'r's Ex. 9 at 13 (neurologist Dr. Aaen suspecting conversion disorder). Only rheumatologist Dr. Sheets and neurologist Dr. Nespeca expressed their doubts as to the diagnosis of conversion disorder and both considered a possible diagnosis of encephalomyelitis, though neither could articulate a definitive diagnosis. Following Petitioner's positive α3-AChR testing, Dr. Nespeca opined the results may be associated with her disease process, due to case reports associating "a variety of symptoms of autonomic dysfunction, peripheral neuropathy, and cognitive disorders" with the presence of the antibody. Pet'r's Ex. 3 at 1061. In the immediate aftermath of these results, both Dr. Nespeca and Dr. Sheets characterized Petitioner's injury as a possible diagnosis of autoimmune encephalomyelitis. However, as her treatment continued, their diagnosis became less specific, with both practitioners most commonly referring to Petitioner's condition as a "presumed autoimmune neurological disorder." *Id.* at 1525. Two years into her treatment with Dr. Nespeca, he noted that Petitioner's symptoms were not consistent with the autonomic failure associated with elevated α3-AChR and specifically ruled out POTS as a diagnosis. Pet'r's Ex. 59 at 498. This is particularly notable given that McKeon et al. found 54% of patients with low-titer elevated α3-AChR had either a non-immune-mediated neurological disorder or a nonneurological disorder. Petitioner also points to a reference of autoimmune encephalomyelitis in the report of a social worker from July 2020 following a visit with Petitioner; however, the reference specifically refers to Petitioner's diagnosis as "Autoimmune Encephalomyelitis following Tdap vaccine, *per client*," and thus is not an actual diagnosis from a treating physician. Pet'r's Ex. 58 at 8 (emphasis added).

Further, it is notable that Petitioner's elevated α3-AChR appeared to be the only objective indicator of a potential brain injury. Multiple MRIs revealed no abnormalities and video EEGs which captured her episodes did not reveal an electroencephalographic seizure pattern. Petitioner's CSF testing also did not show signs of inflammation. Petitioner had a very limited response to steroids, to the point that Dr. Sheets became worried about restarting her on higher dosages or pursuing more aggressive therapies at the suggestion of her family. It was also at this point that Dr. Sheets began to speculate whether stress was a trigger for her symptoms because "she [was] flaring her symptoms . . . as school starts and . . . she [was] not able to go to school because of this." Pet'r's Ex. 3 at 1590.

Even assuming *arguendo* that Petitioner intended to claim encephalitis and not encephalomyelitis as her injury, Dr. Huq's application of the Graus et al. criteria to Petitioner's history is flawed. The paper itself notes that the "[e]xisting diagnostic criteria for autoimmune encephalitis [is] too reliant on antibody testing and response to immunotherapy" due to the varied meaning of antibody presence and the variation in response to immunotherapy. Pet'r's Ex. 65 at 1. The first criterion, subacute onset of working memory deficits, altered mental status, or psychiatric symptoms, is met in this case. *See id.* at 3. However, where Dr. Huq's analysis begins to fray is in the second and third criteria.

The second criterion, according to the authors, is for the presence of at least one of the following: new focal CNS findings, seizures not explained by a previously known seizure disorder, CSF pleocytosis, or MRI features suggestive of encephalitis. Pet'r's Ex. 65 at 3. Here, Petitioner

40

does not have seizures as shown by multiple EEGs, her CSF was normal, and her MRIs revealed no abnormalities. Rather, Dr. Huq relies on the presence of new focal CNS findings to argue Petitioner has met this criterion, pointing to instances of headaches, tremors, and "unusual movements." Tr. 106. However, these symptoms were described as "entirely nonfocal" by Petitioner's treating physicians, and they could not identify a neurologic diagnosis. Pet'r's Ex. 3 at 344. I find it persuasive that Dr. Lancaster, an author of this paper, disagrees with Dr. Huq's application of it. He notes the overall lack of objective findings outside the presence of α3-AChR antibodies and that Petitioner's presentation does not constitute the kind of focal CNS deficits referred to in the paper. I also find it notable that Petitioner's neurologic exams were consistently normal, even when she experienced episodes during visits with her providers.

Assuming these symptoms could constitute sufficient focal CNS findings to satisfy the second criterion, Dr. Huq's analysis of the third criterion also falls short. His analysis to this point consists of ruling out a potential viral infection, instead characterizing her febrile illness as "prodromal symptoms" of an autoimmune encephalitis. Tr. 107. Though he does not directly address conversion disorder in the context of an alternate cause for the Graus et al. criteria, he does argue she does not have conversion disorder largely based on the opinions of Dr. Sheets and Dr. Nespeca. What Dr. Huq does not address is the consistent flaring of Petitioner's symptoms around her scheduled returns to school, something noted by several of her providers, including Dr. Sheets. Dr. Huq also argues that Petitioner had no history of abuse and that a psychiatrist did not diagnosis Petitioner with a DSM V diagnosis, meaning that Petitioner cannot have conversion disorder because that is a DSM V diagnosis. However, I find Dr. Lancaster's explanation of this point in the entitlement hearing to be persuasive, especially given that Petitioner's symptoms consistently flared around the time she would be scheduled to return to school, and could be a potential stressor, triggering a conversion reaction.

This leaves the presence of α3-AChR antibodies as the sole objective evidence of a potential autoimmune injury, however, I do not find this alone to be a sufficient indicator of such an injury in Petitioner's case. Petitioner's α3-AChR varied between 0.06 nmol/L at its lowest to 0.11 nmol/L at its highest, which would fall into the low-titer and lower portion of the medium-titer levels identified by McKeon et al., respectively. Pet'r's Ex. 40 at 5. It was in these ranges where the authors identified a majority of the low-titer presentations as non-immune-mediated neurological disease or non-neurologic diseases entirely. *Id.* The authors also explicitly stated that "[i]t is unlikely that the AChR α3-subunit is the primary autoantibody target in all neurological presentations described in this article." *Id.* at 7. Further, Ebright et al. provides a useful analysis of the potential for false positives from this test, noting that in the case of α3-AChR ABV there was a false-positive rate of 86%. Resp't's Ex. A, Tab 3 at 6. Dr. Huq argues that McKeon et al. "interpret their own data differently," however, this figure would seem to align with the rate of non-neurologic disease and the disclaimer provided by the authors, providing caution against using the presence of low-titer antibodies as a diagnostic tool for encephalitis, encephalopathy, or encephalomyelitis. Pet'r's Ex. 61 at 5. Dr. Nespeca's comments that Petitioner's presentation was inconsistent with reports of elevated α3-AChR is also persuasive to this point.

In sum, although some of her providers suspected an autoimmune encephalomyelitis as the cause of Petitioner's symptoms, her overall course of progression appear to detail these providers continuing to return to the possibility of conversion disorder, despite their own notations regarding the potential pathogenic presence of α3-AChR antibodies. Because I do not find that the presence of these antibodies at the levels demonstrated in Petitioner's case to be sufficient evidence of autoimmune encephalomyelitis on their own, and because no other objective findings showed

evidence of autoimmune encephalomyelitis, Petitioner has failed to provide preponderant evidence that she suffered from autoimmune encephalomyelitis. Instead, I find the record preponderantly reflects that Petitioner suffered from conversion disorder.

### B. *Althen* Prong One

Under *Althen* prong one, Petitioner must set forth a medical theory explaining how the received vaccine could have caused or sustained injury. *Andreu*, 569 F.3d at 1375; *Pafford*, 451 F.3d at 1355–56. Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. *Boatmon*, 941 F.3d at 1359; *see also Knudsen*, 35 F.3c at 548; *Veryzer v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 214, 223 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"), *aff'd* 475 F. App'x 765 (Fed. Cir. 2012). If Petitioner relies upon a medical opinion to support her theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. *See Broekelschen*, 618 F.3d at 1347 ("The special master's decision oftentimes is based on the credibility of the experts and the relative persuasiveness of their competing theories"); *Perriera v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing *Fehrs v. United States*, 620 F.2d 255 (Ct. Cl. 1980))). Importantly, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde*, 746 F.3d at 1339. Instead, Petitioner must show it was more likely than not that the vaccine caused the condition alleged. *Id.*

Although Petitioner primarily focused her analysis on a theory regarding autoimmune encephalomyelitis, she also contends that if she suffered from conversion disorder it was also caused by the Tdap vaccine. Dr. Huq's theory rests on an elevated cytokine response from Petitioner's Tdap vaccine resulting in peripheral inflammation, which disrupted the blood brain barrier, leading to "a proinflammatory state and trigger[ing] sickness behavior or even conversion disorder in a susceptible individual." Pet'r's Ex. 72 at 3. However, this theory is wholly without support. Dr. Huq cites to Ercoli et al., a case report of functional neurologic disorder following COVID-19 vaccination, as evidence that vaccine inflammation can cause conversion disorder. However, the authors of this report go to great lengths to explain the occurrence of these symptoms likely relates to abnormal expectations about illness and stress from the pandemic, even stating that "[i]t's important to recognize FND symptoms and to reassure public opinion that these are not neuro-toxic effects of the vaccine." Pet'r's Ex. 76 at 2. Dr. Huq also cited Feltz-Cornelis et al. and Kozlowska et al. to show that conversion disorder is associated with systemic low-grade inflammation, however, neither of these two articles point to inflammation as a cause of conversion disorder, but rather as a result of the stress system that is activated in patients with conversion disorder. Kozlowska et al., which found elevated CRP was associated with patients with conversion disorder, cautioned that "CRP is a nonspecific marker of inflammation, and our findings of elevated CRP [titers] in our patients with [conversion disorder] provide no information about the origin and location of immune cell activation and [signaling]." Pet'r's Ex. 81 at 8. Feltz-Cornelis et al., which reviewed the presence of elevated inflammation in conversion disorder patients, cautioned that their study was not generalizable due to the limited sample size available and the lack of a proper control group. Pet'r's Ex. 77 at 11. Although Dr. Huq has explained how a generic vaccine could cause local inflammation following administration, he has not explained how this acute reaction could result in a prolonged immune response, or how these submitted

articles he provides stand for the proposition that a vaccine could cause sufficient, chronic low-level inflammation to permeate the blood brain barrier and cause conversion disorder.

After consideration of the evidence, I find that Petitioner has not presented preponderant evidence of a sound and reliable medical theory to explain how the Tdap vaccine can cause conversion disorder. Therefore, Petitioner does not meet her burden pursuant to *Althen* prong one.

### C. *Althen* Prong Two

Under *Althen* prong two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Capizzano*, 440 F.3d at 1324 (quoting *Althen*, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" *Pafford*, 451 F.3d at 1356 (internal citations omitted). This includes instances where an action is "a substantial factor in bringing about the harm, and that the harm would not have occurred but for that action." *Shyface*, 165 F.3d at 1365 (internal citations omitted). The Federal Circuit has explained that in such cases, "while the vaccination must be a substantial factor in the [injury], it need not be the sole factor or even the predominate factor." *Pafford*, 451 F.3d at 1357.

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause-and-effect show[s] that the vaccination was the reason for the injury.'" (quoting *Althen*, 418 F.3d at 1280)). Medical records are generally viewed as trustworthy evidence, since they are created contemporaneously with the treatment of the vaccinee. *Curcuras*, 993 F.2d at 1528. Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano*, 400 F.3d at 1325. Instead, Petitioner may satisfy her burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325–26.

A successful argument pursuant to *Althen* prong two is heavily dependent on a reliable causation theory. Petitioner's inability to meet her burden demonstrating how the Tdap vaccine can cause conversion disorder effectively precludes her from being able to show that her symptoms were actually caused by the vaccine according to said theory. This hinders any meaningful discussion on prong two.

Although Petitioner's treating physicians initially suspected vaccine causation when they were considering GBS as a diagnosis, this possibility was quickly ruled out. *See* Pet'r's Ex. 4 at 17. As Petitioner's diagnosis evolved to conversion disorder with a possible differential of autoimmune encephalomyelitis, her providers continued to discredit vaccine causation, including those who suspected an autoimmune etiology. *See* Pet'r's Ex. 3 at 667 (Dr. Sheets opining that Petitioner's symptoms were not caused by the vaccine), 405 (Dr. Stephens noting that she had "never seen any reaction to immunization create this set of symptoms), 940 (Dr. Sawyer noting that vaccine causation was "very unlikely"), 1066 (Dr. Nespeca stating that he had "not see such symptoms occur in temporal relation to her Tdap immunization"), 1525 (Petitioner's father expressing a theory to Dr. Nespeca that he believed the Tdap immunization caused Petitioner's

elevated α3-AChR), 1684 (Dr. Nespeca explaining to Petitioner's family that "disorders have a more compelling association with elevation of this antibody than do immunizations"). Although Petitioner's parents continuously expressed a belief that her symptoms were caused by the Tdap vaccine, her treating physicians consistently dismissed this theory regardless of the working diagnosis.

In considering the reliability of a petitioner's evidence of a prima facie case, the special master may consider alternative causes for a petitioner's condition that are reasonably raised in the record, even if the respondent does not pursue a formal alternative cause argument. *Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349, 1358 (Fed. Cir. 2010). Thus, in weighing a petitioner's case-in-chief, a special master may consider evidence that the petitioner's alleged injury could have been caused by alternative causes. *Id.*

Throughout Petitioner's course of treatment it was consistently noted that her symptoms flared around the start of school, and school was frequently identified as a potential stressor. Although Dr. Nespeca opined Petitioner did not fit the typical profile of a psychosomatic condition because she was "anxious to get back to school," he also acknowledged that her symptoms may be related to anxiety caused by school. Pet'r's Ex. 3 at 1065. Several of Petitioner's other treating physicians also noted her symptoms flared around her scheduled returns to school, with Dr. Sheets specifically questioning whether "stress is the trigger for these symptoms at this time." *Id.* at 1590. Petitioner's symptoms appeared to improve once taken out of school, particularly when the school year ended, only to reemerge soon before or after she was scheduled to return to the classroom. *See* Pet'r's Ex. 3 at 173 (Petitioner's symptoms reappeared when she returned to school in October 2017), 891 (preparing Petitioner to return to school after improvement of symptoms in January 2018), 1587 (Petitioner pulled back out of school after one week after she began experiencing four-to-five episodes per day in September 2018); Pet'r's Ex. 3 at 1880 (Petitioner discussing plan to return to school in spring following improvement of symptoms in December 2018); Pet'r's Ex. 8 at 12 (reporting that Petitioner was unable to go to school due to experiencing five episodes per day in January 2019 after experiencing no episodes in December 2018); Pet'r's Ex. 8 at 39 (reporting improvement of symptoms in June 2019 with plans to return to school in fall); Pet'r's Ex. 8 at 52 (reporting sudden new onset of symptoms after largely asymptomatic summer following return to school in September 2019); Pet'r's Ex. 59 at 55 (Dr. Nespeca informing Petitioner she can return to school if she can go three weeks without an episode). Further, as noted above, Petitioner did not explain how the Tdap vaccine could cause a systemic, low-grade inflammatory response, which could allegedly lead to the development of conversion disorder. For these reasons, I find Petitioner has failed to provide preponderant evidence of a logical sequence of cause and effect between her Tdap vaccination and her conversion disorder.

## D.  *Althen* Prong Three

*Althen* prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been defined as a "medically acceptable temporal relationships." *Id.* Petitioner must offer "preponderant proof that the onset of symptoms occurred within a time frame for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan*, 539 F.3d at 1352. The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under *Althen* prong one). *Id.*; *Koehn v. Sec'y of Health & Hum. Servs.*, 773 F.3d at 1239, 1243 (Fed. Cir. 2014); *Shapiro*, 101 Fed. Cl. at 542; *see Pafford*, 451 F.3d at 1358. A temporal relationship between a

vaccine and an injury, standing alone, does constitute preponderant evidence of vaccine causation. *See, e.g., Veryzer*, 100 Fed. Cl. at 356 (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that [P]etitioner must posit a medical theory causally connecting the vaccine and injury"). Petitioner asserts her symptoms began three weeks following vaccination. However, neither Petitioner nor her expert provide an explanation for this three-week temporal relationship between the administration of the Tdap vaccine and the development of conversion disorder. Accordingly, Petitioner fails to prove *Althen* prong three.

## VII.    Conclusion

For the reasons discussed above, I find that Petitioner has not established by preponderant evidence that her Tdap vaccine caused her to suffer from autoimmune encephalomyelitis, autoimmune encephalitis, autoimmune encephalopathy, POTS, a peripheral neuropathy, a small fiber neuropathy, or an alpha-3 nicotinic receptor antibody disease with partial autonomic failure, or caused her conversion disorder. However, the medical record clearly indicates that Petitioner is suffering from some sort of condition. I do empathize with the harsh realities of trying to manage everyday life as a teenager, only for these struggles to be exacerbated by a myriad of unexplained and untreated symptoms. I have made a thoughtful and thorough consideration of all the evidence presented, and I appreciate Petitioner's desire to understand what happened to her. That said, the evidence unfortunately does not establish that it is more like than not that her Tdap vaccine is to blame. Therefore, Petitioner is not entitled to compensation, and I must **DISMISS** her claim.[55]

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master

---

[55] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.